1

2                    **UNITED STATES DISTRICT COURT**

3                   **FOR THE DISTRICT OF ARIZONA**

4                   _____

5   **United States of America,**    )
                                      )   No. **CR 14-1461-PHX-NVW**
6              Plaintiff,             )
                                      )
7          vs.                        )   Phoenix, Arizona
                                      )   July 20, 2015
8   **Javier Sebastian Andres (1),**  )   9:45 a.m.
    **Celestina Elizabeth**           )
9   **Perez-Cos (2),**                )
                                      )
10             Defendants.            )
    _____   )

11

12          **BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE**

13             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14          (*Sentencing - Javier Sebastian Andres*)
            (*Sentencing - Celestina Elizabeth Perez-Cos*)

15

16

17

18

19

20
    Official Court Reporter:
21   Laurie A. Adams, RMR, CRR
    Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, Spc 43
    Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

25

```
1    APPEARANCES:

2
     For the Plaintiff:
3
             U.S. ATTORNEY'S OFFICE
4            By:  Rachel Reames Stoddard, Esq.
             2 Renaissance Square
5            40 N. Central Avenue
             Suite 1200
6            Phoenix, AZ 85004

7    For the Defendant Javier Sebastian Andres:

8            LAW OFFICE OF ATMORE L. BAGGOT
             By:  Atmore L. Baggot, Esq.
9            1615 North Delaware Dr.
             Apache Junction, Arizona 85120
10
     For the Defendant Celestina Elizabeth Perez-Cos:
11
             FEDERAL PUBLIC DEFENDER'S OFFICE
12           By:  Richard L. Juarez, Esq.
             123 N. San Francisco Street
13           Suite 204
             Flagstaff, AZ 86001
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The defendants were assisted during the following
 3    proceeding by the official court interpreter.)
 4              THE COURTROOM DEPUTY:  This is Criminal Case
 5    2014-1461-02, United States of America versus Celestina        09:45:34
 6    Elizabeth Perez-Cos.  This is the time set for sentencing.
 7    Counsel, please announce for the record.
 8              MS. STODDARD:  Good morning, Your Honor.  Rachel
 9    Stoddard on behalf of the United States.  I'm joined at counsel
10    table by Special Agent Ryan Blay with the FBI.                 09:45:47
11              MR. JUAREZ:  Richard Juarez on behalf of Ms.
12    Perez-Cos, who is present and in custody, Your Honor.
13              THE COURT:  Good morning, counsel.
14              And good morning, Ms. Perez-Cos.  You may come up to
15    the podium.                                                    09:46:00
16              THE COURT:  All right.  Ms. Perez-Cos, would you
17    please state your full name and date of birth.
18              DEFENDANT PEREZ-COS:  Celestina Elizabeth Perez-Cos.
19    February 23rd of '86.
20              THE COURT:  You are being assisted by an interpreter. 09:46:43
21    Are you able to understand everything she says?
22              DEFENDANT PEREZ-COS:  Yes.
23              THE COURT:  And let me identify the documents that I
24    have.  I have the plea agreement, the presentence investigation
25    report, the sentencing recommendation, the defendant's         09:46:56
```

1  objections to the presentence investigation report, the

2  defendant's motion for downward variance.  I have the

3  government's response to the objections to the presentence

4  report with attachments.  And I also have the victim impact

5  statement and various letters of support for the defendant.          09:47:21

6  And I have the addendum to the presentence report.

7          Counsel, are there any other documents I should have?

8          MS. STODDARD:  No, Your Honor.

9          MR. JUAREZ:  No, Your Honor.

10         THE COURT:  Let me summarize the terms of the plea          09:47:36

11  agreement.  The defendant agrees to plead guilty to Count 4,

12  harboring an alien for private financial gain.  The government

13  will recommend a sentence at the low end of the applicable

14  guideline sentencing range but it is not binding on the Court.

15  It is agreed that the defendant's sentence shall not exceed a          09:48:07

16  term of 18 months in prison.  And the parties agree that the

17  only specific offense characteristic under Guideline 2L1.1 that

18  possibly applies to this defendant is Guideline 2L1.1(b)(8)(A).

19  And the defendant may oppose the application of the offense

20  characteristics and the government may support them, may argue          09:48:38

21  in support of them.

22         And that is the guideline for a two-level enhancement

23  up to a minimum of 18 levels where the alien was involuntarily

24  detained in connection with the demand for payment.

25         The government agrees to dismiss Counts 1, 2, and 3 of          09:49:11

the indictment, and the government agrees not to prosecute the
defendant for any other offenses committed by the defendant and
known to the government in connection with the time period
involved in this case.

Counsel, have I correctly summarized the plea
agreement?

MS. STODDARD:  Yes, Your Honor.

MR. JUAREZ:  Yes, Your Honor.

THE COURT:  When determining the sentence to be
imposed today, I will consider the factors specified in Title
18, United States Code Section 3553(a) including the sentencing
guidelines and any applicable policy statements published by
the U.S. Sentencing Commission, and I must impose a reasonable
sentence.  I'm not compelled to impose a sentence within the
range determined by application of the sentencing guidelines.
The guidelines do not establish a presumption of what the
sentence should be or of what is a reasonable sentence.  The
guidelines are given no more nor less weight than any other
statutory factors.

In imposing a sentence, the Court will make an
individualized determination based on the facts of this case.
However, I must impose a sentence within the terms of the plea
agreement unless I reject the plea agreement.

Would both counsel confirm that they and the defendant
have received the presentence report and the addendum?

09:49:34

09:49:43

09:50:01

09:50:17

09:50:31

```
1              MS. STODDARD:  Yes, Your Honor.

2              MR. JUAREZ:  Yes, Your Honor.

3              THE COURT:  And Mr. Juarez, would you confirm that you

4  and your client have read and discussed the presentence report

5  and the addendum?                                                    09:50:44

6              MR. JUAREZ:  We have, Your Honor.

7              THE COURT:  All right.  I will hear the objections.

8  I'm not entirely sure, Mr. Juarez, whether all the objections

9  remain, so we have the objection to the guideline I just

10 mentioned.  But I will let you present any other objections you    09:51:10

11 wish to present, and if you don't I will take them as waived.

12              So please proceed.

13              MR. JUAREZ:  Yes.  Thank you, Your Honor.  When I

14 first read the presentence report, I was struck by the

15 narrative that was noted in there because after reviewing         09:51:30

16 different documents of discovery, particularly -- now, Your

17 Honor, should I name the victim?  I know we had an order.

18              THE COURT:  I don't recall the order, but, of course,

19 the presentence report names her but that's not publicly

20 available.                                                          09:52:04

21              What's your response to that, Ms. Stoddard?

22              MS. STODDARD:  Your Honor, my only request would be

23 for purposes of protecting the victim's identity because she

24 was a minor when this began that any future transcript if

25 needed of this proceeding would be sealed.                         09:52:17
```

UNITED STATES DISTRICT COURT

1        THE COURT:  I think it wiser to simply refer to her

2   without naming her so we don't have to seal the transcript.  So

3   just refer to her as the victim.  And there having been a

4   guilty plea, it's appropriate to use that terminology.

5        So you may proceed, Mr. Juarez.                           09:52:34

6        MR. JUAREZ:  And I will note in my filings I just

7   referred to as the alien, referring back to the guidelines when

8   we're talking about aliens.

9        But in any case, in this case, I was struck by the

10  one-sidedness of the narrative, and so my initial objections   09:52:47

11  were to attempt to provide a more -- a narrative that was more

12  in keeping with, I believe, the facts of the case.  The Court

13  has a copy of the victim's declaration, I believe, that we all

14  referred to in reference to what the facts were of the case

15  just using her own words as to what she recounted about her     09:53:11

16  experience in the defendant's home.

17        I'm not going to go through all of them, because I

18  did, I believe, I set them out fairly well.  But I did want to

19  point out a couple of things.  The term "escape" has been used

20  quite liberally when the victim escaped in December and it      09:53:38

21  outlined a scenario where she hid behind the car after the

22  defendant, her husband, and the children returned from church.

23  However, I believe that term is misapplied in this situation,

24  and I specifically draw -- or point out the section of the

25  defendant -- the victim's declaration where she talks about     09:54:10

1    having the days prior to her, quote, escape which is Page 36 of

2    the government's disclosure and part of their exhibit.  In

3    that, on Page 36, she describes at the top of the page where

4    Elizabeth, my client, is telling her that she can leave, that

5    she's fed up with her.  You are belligerent and spoiled.  And          09:54:51

6    she remarks, no, I'm not going to leave.  I'm not going to give

7    you that money.  I will keep putting up with it.  No, I will

8    complete my time.  She says, I went to my room and I stayed

9    there for about two days.  I came out, and after while she kept

10   scolding me.  I told you to leave.  I don't care where you go.        09:55:19

11   I told you to leave.  So I went to my room again.

12        So I'm not sure why the victim described her leaving

13   the house as escape, because obviously, at that point my client

14   had about enough of her because of their interactions

15   throughout the couple years that she was with them.  And she          09:55:50

16   was even urging her to leave.  So I believe that term is

17   misapplied in this situation.

18        Also, there was a description of how my client would

19   be monitoring her telephone calls, which I believe under the

20   circumstances would be impossible.  I think it's fairly              09:56:19

21   established that the victim spoke with her mother in Chuj, I

22   believe, is he how she pronounced the indigenous language she

23   used.

24        THE COURT:  I take it that's an Indian language?

25        MR. JUAREZ:  Yes, which my client did not speak.  And           09:56:36

```
 1    she was given full opportunity to talk in private with her
 2    mother.  She would go outside.  So there was no monitoring.  It
 3    would have been impossible to monitor that conversation.
 4         And the -- I objected to the inclusion of the
 5    relationship between the victim and the defendant's husband        09:57:08
 6    behind her back, specifically, there were certain incidences
 7    that happened that Elizabeth was not privy to.
 8         THE COURT:  Mr. Juarez, let me interrupt you.  I'm
 9    sorry.
10         I see Mr. Baggot is here.  Mr. Baggot, I was thinking        09:57:24
11    it might be wise if your client were also present for this
12    proceeding.  Do you have a view on that?
13         MR. BAGGOT:  That would be fine, Your Honor.  These
14    two go together.
15         THE COURT:  You know, I had the thought, too, that it        09:57:36
16    might have been more appropriate to do the sentencing together,
17    at least part of it, because some of the issues are identical
18    between the two defendants.  And anything that might be said
19    with respect to one would be relevant to the other.
20         MR. JUAREZ:  Your Honor, we have no objection to --          09:57:55
21         MR. BAGGOT:  I think that would be a good idea except
22    he doesn't speak English so we would have to do the
23    interpretation for him somehow.
24         THE COURT:  Yes.  Well, he could stand at the --
25         MR. BAGGOT:  Yes.  That's fine.  I think that would be       09:58:09
```

1    a good idea.

2          THE COURT:  There are aspects of these two sentencings

3    that would be quite different, but there is much that is

4    overlapping, including the question of whether either plea

5    agreement adequately reflects the seriousness of the offense    09:58:32

6    conduct and whether the plea agreement should be accepted at

7    all.  So issues of that character would, to some extent,

8    overlap between the two defendants.  And the issue that Mr.

9    Juarez is bringing up really may have a common interest.

10         Well, counsel, I'm hearing you both agree.  Does the    09:58:55

11   government have any objection to proceeding in that fashion?

12         MS. STODDARD:  No, Your Honor.

13         THE COURT:  All right, then.  Let us do that.  Mr.

14   Juarez, let me let you hold your objections.  Let's bring in

15   Mr. Andres, and then I will begin the proceeding with him to    09:59:19

16   get up to the point that we are now with Ms. Cos.  And then we

17   can proceed with both of them together.

18         Anybody have a problem with proceeding in that

19   fashion?

20         All right then, Mr. Juarez.  If you and your client    09:59:33

21   would take a step back to the counsel table and we'll bring in

22   Mr. Andres and proceed with him separately.  And then when we

23   get up to this point I will ask you all to return to the podium

24   so everything that may be said by either may have whatever

25   benefit it has for both.    09:59:52

1    With that, you may take a seat back at counsel table

2  and I ask the marshals to bring Mr. Andres in.

3    Actually, now, I think, Mr. Juarez, if Ms. Cos would

4  like to have the interpretation for the allocution then she

5  will need to stand up here so she can hear the interpreter,          10:00:28

6  whichever, or if she wishes to just not have that until we get

7  to the point where we're left with her, I leave that to your

8  choice.

9    MR. JUAREZ:  I will just have her stand to the side.

10    THE COURT:  All right.  Very well.                                 10:00:55

11    We'll call the case for Mr. Andres.

12    THE COURTROOM DEPUTY:  This is Criminal Case

13  2014-1461-01, United States of America versus Javier Sebastian

14  Andres.  This is time set for sentencing.

15    Counsel, please announce for the record.                          10:01:17

16    MS. STODDARD:  Again, Your Honor, Rachel Stoddard on

17  behalf of the United States.  And I'm joined at counsel table

18  by Special Agent Ryan Blay.

19    MR. BAGGOT:  Atmore Baggot on behalf of Javier Andres

20  who is now present in court with the interpreter.                   10:01:30

21    THE COURT:  Good morning, counsel.  And good morning,

22  Mr. Andres.

23    Mr. Andres, we had the sentencing for your wife and

24  for you set at different times, but the lawyers and I have

25  agreed that it would be actually helpful to everyone if we did      10:01:43

1    both the sentencing together.  There would be parts of each

2    sentencing that would be limited to each defendant.  So parts

3    of what we'll do will only deal with you, and parts of what we

4    do will only deal with your wife.  But other parts that we talk

5    about will pertain to both of you.  And I will be careful to          10:02:03

6    indicate when I may have discussion that only relates to you or

7    to your wife.

8         And so we had already begun this proceeding with your

9    wife when we decided to do it this way, so I'm going to ask you

10   some questions now to get up to the point where we were in the      10:02:22

11   proceeding with your wife's sentencing.  And then we'll do it

12   together.

13        Do you understand?

14        DEFENDANT ANDRES:  Yes.

15        THE COURT:  All right.  Very well then.                          10:02:37

16        Mr. Andres, would you please state your full name and

17   date of birth?

18        DEFENDANT ANDRES:  Javier Sebastian Andres.  April

19   20th of 1979.

20        THE COURT:  And you are being assisted by an                     10:02:55

21   interpreter.  Are you able to understand everything she says?

22        DEFENDANT ANDRES:  Yes.

23        THE COURT:  And let me identify the documents that I

24   have in your case.  I have the plea agreement, the presentence

25   investigation report, the sentencing recommendation.  I have        10:03:10

```
1    the defendant's objection to the presentence report, the
2    government's response to the defendant's objection with
3    attachments.  I have letters of support of the defendant and I
4    have the victim impact statement from the victim.  And finally,
5    I have the addendum to the presentence report.                    10:03:42
6         Counsel, are there any other documents I should have
7    in this case?
8         MS. STODDARD:  No, Your Honor.
9         MR. BAGGOT:  Your Honor, the discovery provided by the
10   government has 2012 entries.  All of those are relevant to the    10:03:54
11   sentencing today, but I certainly don't expect the Court to go
12   through all of those.  So I will be referring to some of those
13   as we go through the proceeding.  But those are also relevant.
14        THE COURT:  I do have the attachments to the
15   government's memorandum.                                          10:04:10
16        MR. BAGGOT:  It's a discovery disk and there's 2012 --
17   this was a tremendous amount of investigation and government
18   effort and social workers to convince this girl that she really
19   was a victim.  You know, they called her 40 times on her cell
20   phone before she even responded, and then the government          10:04:29
21   interviewed the poor girl seven times after that.
22        THE COURT:  Well, I think the best we can do is
23   proceed.  And if I conclude the absence of anything from the
24   record makes it inappropriate to proceed with sentencing then
25   we'll have to continue the proceeding.                            10:04:45
```

1            And let me summarize the terms of the plea agreement.

2    It stipulates that the defendant shall receive a sentence

3    within the applicable guideline range as determined by the

4    Court.  It stipulates that the sentencing enhancement of

5    Guideline 2L1.1(b)(7)(B) regarding a person sustaining serious      10:05:23

6    bodily injury during the commission of the offense shall be

7    applied and included in the calculation of the defendant's

8    applicable guideline range.

9            The defendant will receive a three-level downward

10   adjustment for acceptance of responsibility.  The defendant        10:05:42

11   will pay restitution as ordered by the Court.  And the

12   government agrees to dismiss Counts 1, 2, and 3 as to this

13   defendant at the time of sentencing.

14           Counsel, have I correctly summarized the plea

15   agreement?                                                         10:06:10

16           MS. STODDARD:  Yes, Your Honor.

17           MR. BAGGOT:  Yes, Your Honor.

18           THE COURT:  When determining the sentence to be

19   imposed today, I will consider the factors specified in Title

20   18, United States Code Section 3553(a), including the              10:06:19

21   sentencing guidelines and any applicable policy statements

22   published by the U.S. Sentencing Commission.  And I must impose

23   a reasonable sentence, but I am not compelled to impose a

24   sentence within the range determined by application of the

25   sentencing guidelines, although the plea agreement with respect    10:06:39

1    to this defendant does require that.

2           The guidelines themselves do not establish the

3    presumption of what the sentence should be or of what is a

4    reasonable sentence, nor is the sentence outside the guideline

5    presumed to be an unreasonable sentence.  In imposing a          10:06:58

6    sentence, the Court will make an individualized determination

7    based on the facts of this case.  However, I must impose a

8    sentence within the terms of the plea agreement unless I reject

9    the plea agreement.  And as I have said, the plea agreement

10   requires a sentence within the guideline range.                  10:07:15

11          Now, would both counsel confirm that they and the

12   defendant have received the presentence report and the

13   addendum?

14          MS. STODDARD:  Yes, Your Honor.

15          MR. BAGGOT:  Yes, Your Honor, we have.                     10:07:23

16          THE COURT:  And Mr. Baggot, would you confirm that you

17   and your client have read and discussed the presentence report

18   and the addendum?

19          MR. BAGGOT:  Yes.  And I filed formal objections.

20          THE COURT:  All right.  Now I think we are now caught      10:07:34

21   up to where I was with the proceeding with Ms. Cos.  And so at

22   this time, I would like to proceed together with the sentencing

23   with respect to both defendants.  And again, if we get to the

24   point where something needs to be discussed or addressed only

25   to one defendant, I will be clear about that.  And I invite      10:07:52

1    counsel also to remind me if I should be noting such

2    limitations.

3            All right.  We were discussing with Mr. Juarez his

4    somewhat numerous objections in his written objection to many

5    of the characterizations in the presentence report.  And Mr.          10:08:17

6    Juarez, I will allow you to continue where you left off.

7            MR. JUAREZ:  Thank you, Your Honor.

8            So I was addressing first of all my objections to the

9    narrative which I indicated I felt was -- inappropriately

10   characterized the facts of the case.  And I attempted to               10:09:06

11   indicate in my objections specific reference to the interview

12   that the victim had when the last interviews which is found in

13   the government's Attachment 1.  In thinking about it I think I

14   was going to get into arguments, so I'm not really going to

15   endeavor to specifically note each thing.                              10:09:35

16           But the last item I hoped to address the Court with

17   was the unfairness of including information or facts about the

18   liaison that Mr. Andres had with the victim.  I believe that

19   it's fairly clear from everyone's viewpoint that's mentioned in

20   the report, the victim, Mr. Andres, the members of the church,        10:10:09

21   who, by the way, there are several members of Ms. Perez's

22   church here.  One of them would like to address the Court when

23   it's appropriate.

24           THE COURT:  And I will allow you to present anyone who

25   would like to speak at the time you choose.                            10:10:33

1           MR. JUAREZ:  Thank you, Your Honor.

2           So I believe it's clear that she was kept in the dark

3    about the relationship.  There was a telephone call between Mr.

4    Andres and Mr. Nogales, I believe, who was the victim's

5    brother-in-law, that she was not privy to, where they discussed          10:10:57

6    possible arrangements to have Ms. -- the victim released.  She

7    was not privy to that.  So those are the basis for my arguments

8    for the presentence report.  Those aren't appropriate.

9           THE COURT:  Well, let me hear from Ms. Stoddard.

10          MS. STODDARD:  Yes, Your Honor.  I don't want to          10:11:24

11   belabor the points that I made in the response to the defense

12   objection.  Obviously, the government, through the victim's

13   multiple disclosures, has a very different understanding of the

14   facts of what occurred, not only with this defendant,

15   specifically, Ms. Perez-Cos but also with the co-defendant.  I          10:11:38

16   have addressed each of them in my memorandum.

17          I guess globally what I would say in response to the

18   objections, for example, the objection to the word "escape" is

19   that the word "escape" and escaping from a situation does not

20   just mean escaping from physical handcuffs.  It's escaping from          10:11:57

21   a situation which was very damaging to her and from which she

22   was terrified and scared.

23          The defense has argued that Ms. Perez-Cos told the

24   victim get us $1,000 and leave.  The victim did not have

25   $1,000.  Her family did not have a $1,000 in order to leave,          10:12:13

1    and that, in itself, is a demand for payment in order for her

2    to leave the home and leave a situation in which she was

3    trapped.

4         Regarding the application of Mr. Andres' conduct to

5    Ms. Perez-Cos, I do believe it is relevant as relevant conduct.          10:12:27

6    In fashioning the plea agreements we did try to assign

7    appropriate levels of culpability for each defendant's

8    participation in the conduct with the victim, specifically

9    addressing the sexual situation that occurred and the victim's

10   pregnancy and what she endured through that.  We did assign --           10:12:49

11   it was the government's intent to assign greater culpability to

12   Mr. Andres as opposed to Perez-Cos.  However, she is still

13   responsible for what the victim endured and suffered when she

14   was in her home.  And the argument that she did not know that

15   the victim was pregnant is negated by common sense of the                 10:13:06

16   victim being a very petite girl who was gaining size and

17   stature when she was pregnant and also declarations from

18   members of the church and other individuals who said they, in

19   fact, brought it to Ms. Perez-Cos' attention and asked whether

20   the victim was pregnant.                                                  10:13:25

21        So while I understand that Ms. Perez-Cos may have a

22   different version or a different belief or proffer to the Court

23   of what she believes happened, the information in the

24   government's memorandum and what the government believes

25   happened in the facts of this case and assessing culpability is          10:13:41

1  supported by the facts the victim's declaration and other

2  evidence.

3         THE COURT:  Well, there are, and this is apparent from

4  the objections in the briefing, very different either views or,

5  shall I say, emphases that are irreconcilable in important        10:14:00

6  respects.  I'm satisfied that the, in general, the

7  characterizations and the description are well supported and

8  that the contrary arguments are not persuasive.

9         With respect to the issue of pregnancy, it is clear

10 that Ms. Perez-Cos claims not to have been aware of it, but the   10:14:25

11 recounting of that is an essential part of the context and find

12 there's nothing wrong with that having that recount, including

13 her denial that she knew of it.  I can address later how

14 credible that denial is.

15        The word "escape" here is a fair word.  It's not a       10:14:46

16 charged word in light of the nature of at least Counts 1 and 2,

17 and that goes to both the question of relevant conduct and also

18 specifically the enhancement that guideline 2L1.1(b)(8)(A),

19 which refers to an enhancement that an alien was involuntarily

20 detained in connection with a demand for payment.                 10:15:28

21        Now, I address this to both counsel:  There is a very

22 clear tone in the briefing that the defendants view it as

23 unfair to look to what amounts to be offense conduct in the

24 dismissed counts, which appears to certainly overlap with

25 respect to the enhancement in Guideline 2L1.1(b)(8)(A), and I     10:16:00

1    say to both of you that the actual and reasonable expectations

2    of the defendant in entering into a plea agreement will always

3    be vindicated.  So sometimes it happens that certain counts are

4    dismissed, and yet the practical effect of them come back in

5    the guideline calculations.  And if, in fact, a defendant          10:16:26

6    actually believed, and it was reasonable in light of the

7    communications between the parties, that that offense conduct

8    would not be considered, then I will allow them to withdraw

9    from the guilty plea and the plea agreement.

10          However, in this case, the plea agreement itself            10:16:46

11   specifically notes this enhancement as one that the government

12   can argue it applies and the defendant can oppose it.  So it's

13   really impossible for me to see how either defendant could have

14   an actual belief and a reasonable belief they would not have to

15   confront this enhancement.  Again, if they really thought they    10:17:11

16   didn't and it was reasonable, I would allow them to withdraw

17   from the guilty plea and the plea agreement.

18          So I suppose I need to make a clear record here, so

19   I'm going to ask counsel, I will start with you, Mr. Juarez,

20   whether your respective client had an actual belief, and if so,   10:17:30

21   why it's a reasonable belief, that the enhancement at guideline

22   2L1.1(b)(8)(A), might not -- would not -- well, could not

23   fairly be considered on its merits.

24          MR. JUAREZ:  Well, Your Honor, obviously, the

25   guidelines -- we understand the guidelines.  We know that         10:17:59

1    factors in there.  And in talking with Ms. Perez we addressed,

2    among other things, the guidelines.  We specifically want had

3    the opportunity to address that particular factor.

4         THE COURT:  And I will address it on the merits.  But

5    my threshold question is, and there is a clear favor of this in          10:18:23

6    some of the briefing, that it's just not fair to consider that

7    because that's offense conduct in a dismissed count.  And

8    often, we all know what the guidelines say.  A lot of the

9    times, the exact same conduct is the offense conduct for a

10   count of conviction and for a count that's dismissed by                  10:18:45

11   agreement.  In that situation, there's no doubt the Court can

12   consider that conduct.  The potential unfairness arises when

13   there is additional conduct charged where there's more serious

14   consequences and it is agreed that will be dismissed and the

15   defendant only acknowledges facts with respect to another count         10:19:06

16   and then there's an attempt to basically bring that additional

17   conduct in as a basis for sentencing.  That's the potential

18   unfairness.

19        And as I said, when it goes that way, if the defendant

20   has an actual expectation that will be excluded, that should be         10:19:20

21   vindicated, but again, I'm repeating myself, but the question

22   is whether -- I will decide this on the merits but I want to

23   resolve the threshold question of whether it's unfair to

24   consider it in light of the fact that that conduct also

25   overlaps Counts 1 and 2 which are to be dismissed.                      10:19:38

1    MR. JUAREZ:  And in our view it's not unfair for the

2  Court to address it.  In fact, we contemplated that that would

3  be a factor to be addressed.

4    THE COURT:  Same question to you, Mr. Baggot.

5    MR. BAGGOT:  Your Honor, we understand that relevant          10:19:54

6  conduct will be considered by the Court whether we like it or

7  not no matter what's charged, dismissed, or even acquitted.

8  But the thing we objected to is the probation department's --

9  we object to characterizing this as peonage as akin to slavery.

10  This was a voluntary agreement between the girl and the          10:20:19

11  defendants.  And we think --

12    THE COURT:  I will address the merits of that.  I

13  really want to have a clear record here as to what I just put

14  to Mr. Juarez, and that is there's a flavor in these briefings

15  that it's just not fair to consider that because it also          10:20:36

16  relates to dismissed conduct.  And we're not yet discussing the

17  merits of this objection.  But I want a clear record because

18  if, in fact, your client believed in fact, and reasonably

19  believed, that this would not be considered I will allow him to

20  withdraw from the guilty plea and the plea agreement.  I don't          10:20:54

21  think he did that because it appears to be right on the face of

22  the plea agreement that was put on the table, that this could

23  be decided on its merits and therefore would not be excluded

24  just because it is additional conduct beyond the simple

25  harboring for financial benefit.          10:21:13

1          MR. BAGGOT:  Your Honor, Mr. Andres does not wish to

2     withdraw from the plea agreement.

3          THE COURT:  All right.  I'm taking that as

4     acknowledging that under the terms of the plea agreement it is

5     expressly contemplated that this enhancement will be decided by     10:21:24

6     the Court on it merits and is not precluded because it also

7     extends to conduct beyond Count 4, and that would overlap

8     conduct in Counts 1 and 2.

9          All right.  With that understanding, now, this is an

10    objection both of you have, and I apologize for the digression,     10:21:47

11    Mr. Juarez, but I'm trying to make a clear record.  Please

12    continue.

13         MR. JUAREZ:  Thank you.  In fact, I will move on to

14    that objection at this point.

15         Your Honor, we disagree with the government's position     10:22:05

16    that this should be resolved by a preponderance of the

17    evidence.

18         THE COURT:  I disagree, too.  It's a six-level

19    enhancement, and so I think it needs to be proved by clear and

20    convincing evidence.                                              10:22:17

21         MR. JUAREZ:  And I believe -- and my main argument and

22    support for my argument, again, relies on the victim's own

23    declaration Attachment 1.

24         Now, you have to understand, I think the Court does

25    understand, there's apparently around 30 months where the        10:22:40

```
 1    victim lived with my client.  A lot of things go on in a living
 2    situation.  It's very complex environment there as far as
 3    personalities.  Obviously, the victim and my client did not hit
 4    it off very well initially.  My client was dealing with five
 5    young children.  The youngest had just been born.  She expected   10:23:11
 6    to have someone there to help her, and apparently, the victim
 7    wasn't prepared to take on that type of role.  In fact, she was
 8    very -- well, she didn't even know how to use the basic
 9    implements.
10            But during that course of that 30 months, obviously       10:23:34
11    there's going to be conversations that ensue between everyone
12    in that family.  The victim appears to be a very impressionable
13    young lady.  She took things.  She takes even like body
14    language, she interprets looks, and she sort of puts it into
15    a -- into conclusions that she reaches.  I think it was clear     10:24:05
16    from the fact that Mr. Andres made certain arrangements with
17    the victim and her mother, and I'm not sure initially when I
18    was reviewing the discovery, having read some of the reports,
19    that indicates she was 17, going on 18 when she came over.
20    There was a report that indicated the investigator talked with    10:24:38
21    her mother and her mother quoted her age as 17 when they
22    arranged -- made arrangements for her to come to the United
23    States.  And that was on Page 19 of the disclosure we got.
24            But when she arrived, she was very homesick,
25    initially, it appears.  That was why she was -- she didn't        10:25:13
```

1    feel -- she had been, like, taken from one culture with basics

2    only and put in a house with strangers and all these modern

3    conveniences, a totally different lifestyle than my client had

4    adopted from her years of being here in the United States and

5    that she felt very out of place.  She didn't feel good.  She          10:25:37

6    talked about going back.  She talked to her mother and they

7    agreed that she should stick it out, that she should stay.  So

8    she decided to stay.

9         There were incidences where Ms. Perez was very

10   frustrated with her because she didn't know how to do             10:25:55

11   housework.  She didn't even know how to cook.  Ms. Perez had to

12   even take over the cooking for the family.  So it was a

13   situation where she wasn't providing much help and she may have

14   said certain things in certain ways that the victim took and

15   harbored as far as resentment toward my client.  There was the     10:26:14

16   essential aspect, I believe, for the purpose of this objection

17   that there was money owed.  And certainly there was a contract

18   and an agreement between the parties that Mr. Andres had

19   provided the expenses for her to come here and so she should

20   repay that by doing housework.                                      10:26:38

21        THE COURT:  Mr. Juarez, that contract is patently

22   illegal.  It is an illegal contract.  There's no legal basis to

23   enforce it.  So paying the smuggling fee and getting a promise

24   to pay it back carries no weight under the law.  So I want to

25   hear everything you have to say, but I'm not going to lose          10:26:59

```
1    sight of the legal principles here that govern that have to do
2    with involuntarily detained in connection with a demand for
3    payment.  There's clearly a demand for payment.  The question
4    is whether this is voluntary.  If we want to have some light
5    shed on this, we can look to Title 18, Section -- 18-1589 that    10:27:23
6    dismissed Count 2, that for the forced labor conviction, it is
7    only necessary that the person performing the labor, it is
8    communicated that if they did not perform the labor services
9    that person or another person would suffer serious harm or
10   physical restraint.  And serious harm is defined as any harm,   10:28:05
11   whether physical or non-physical, including psychological,
12   financial, or reputational harm that is sufficiently serious
13   under all the surrounding circumstances to compel a reasonable
14   person of the same background and the same circumstances to
15   perform on continue performing labor or services in order to   10:28:27
16   avoid incurring that harm.
17          And here we have a young woman, 16, 17 years old from
18   utter destitution in Guatemala without education much less
19   culture sophistication or language skills who is in this home
20   and being told she has to work for three years.  Brother-in-law   10:28:49
21   attempted to pay off this illegal debt and was told she has to
22   work for three years.  And there are ample other communications
23   during this time about trafficking people down if they escape,
24   even being -- reference to another woman being sent to a,
25   quote, husband, close quote, which has all the appearances of   10:29:17
```

```
 1   sexual exploitation.  Plus, inability to have recourse to the
 2   authorities because she's an illegal alien.  When you put that
 3   all together, does that amount to, quote, involuntarily
 4   detained, because it is in connection with demand for payment.
 5           My question is a question to you but it's also                  10:29:39
 6   expressing my thinking.  It also goes to why the government is
 7   dismissing Count 2.  So anyway, go ahead, Mr. Juarez.
 8           MR. JUAREZ:  Your Honor, I can see from the Court's
 9   comment you have already made conclusions about what the facts
10   were with respect to the relationship.  We beg to differ with       10:30:00
11   some of that.  Now, specifically, you talked about this
12   telephone call between Mr. Andres and the brother-in-law.  In
13   looking at the dates of that conversation, the victim indicated
14   that she and he had relationships starting in December going
15   into January.  She found out she was pregnant.  The               10:30:30
16   conversation between Mr. Nogales and Mr. Andres happened
17   sometime in February or so after she was pregnant.  The victim
18   said in her narrative that Mr. Andres, when she told him she
19   was pregnant, he said, well, I will send you to your sister's
20   in Georgia.  She said no, I don't want to go to Georgia because   10:30:54
21   she would be ashamed.  She's pregnant with a man's child.
22   She's not married.  She didn't want her sister to know about
23   it.  So under that scenario, I assume -- now, again, my client
24   was not privy to that, but he then had a conversation with the
25   brother offering to take her off his hands to pay her -- now, I    10:31:14
```

UNITED STATES DISTRICT COURT

1    don't know what his motives were for saying no.  I mean, that

2    would seem to be contradictory to everything that we learned

3    that she was told she had to pay this amount according to the

4    narrative.  But I suspect if that was what was happening, that

5    he was simply telling him, no, you are not going back, I mean,          10:31:37

6    you can't have her, because she had told him she didn't want to

7    go back to her sister's.

8         So that's why I said it's a complicated scenario here,

9    and there's a lot of things going on with that.  But in any

10   case, my client wasn't privy to that, and that's why it's not          10:31:58

11   fair to keep that on her.

12        THE COURT:  With respect to Ms. Perez-Cos, I think we

13   have to look at her situation and what she knew and was not

14   free to blind herself to.  So we have a young -- this actually

15   looks like a paradigm of a human trafficking case.  Mr. Andres          10:32:21

16   arranges to illegally smuggle an alien in for the purpose of

17   working.  The agreement is they will work for three years to

18   work off a $4,000 smuggling fee and $100 a month to be paid to

19   her family, only $630 was ever paid.

20        If you take 15 hours a day, seven days a week as          10:32:53

21   paying off the $4,000 smuggling fee, which is an illegal debt,

22   plus the $100 a month to her mother, only which a sixth only

23   ever got paid, that comes down to 47 cents an hour, including

24   payment of the illegal debt.  It's 25 cents an hour if you

25   think her mother was going to get paid, which her mother wasn't          10:33:17

1    paid most of it.  It comes down to about five cents an hour

2    with respect to what her mother was actually paid.  This is a

3    human trafficking case.

4         So with respect to Ms. Perez-Cos, what we have to look

5    at is, what did she know or fairly know?  She had basically          10:33:33

6    someone working in her house for essentially nothing, 47 cents,

7    except for paying off an illegal smuggling debt, taking care of

8    her children, her family, 15 hours a day, seven days a week.

9         So and just as the jury has to draw persuasive

10   inferences from the circumstances, persuasive beyond a              10:34:05

11   reasonable doubt, the Court has to draw inferences to a

12   standard of clear and convincing evidence.  And so the question

13   here is what is the degree of culpability Ms. Perez-Cos has

14   being in that situation.

15        And by the way, Mr. Juarez, the discussion in your            10:34:24

16   brief when you said here about the clashes between the two of

17   them, I may or may not have to resolve that, but I don't think

18   I do.  If they liked each other or didn't like each other, this

19   is a garden variety human trafficking case that went on for two

20   and-a-half years.  So if it's a human trafficking case and she     10:34:44

21   has culpability, defendant has culpability, again, with respect

22   to what the parties have agreed I may decide, it's this

23   enhancement.  And I have to decide whether dismissing the

24   forced labor count should be allowed or whether the plea

25   agreement, either one or both of them, should be rejected.  So     10:35:12

1    the discussion really overlaps both those questions.

2          Now, so as I said, I can accept that the victim here

3    being from a dirt poor rural peasant family in Guatemala didn't

4    know how to run washing machines and probably wasn't very

5    happy.  But that doesn't seem to count at all in terms of          10:35:37

6    mitigation for a rather dazzling human trafficking case.

7          So that's the analysis that strikes me that I have to

8    pursue.  And then the question is, what is persuasive to a

9    standard of clear and convincing evidence with respect to Ms.

10   Perez-Cos as to the involuntary detention, involuntary in the     10:36:07

11   broad sense that we can certainly draw on the forced labor

12   statute.

13         So this is the problem I'm wrestling with.  It is more

14   difficult for Ms. Perez-Cos.

15         MR. JUAREZ:  Your Honor, with all due respect, you          10:36:32

16   know, the scenario we're dealing with is typical of the illegal

17   aliens experience in coming to the United States.  They always

18   have someone transport them.  They also incur a debt.

19         THE COURT:  And they are free to walk away on day one

20   and they are free not to be intimidated or pressured to do        10:36:56

21   anything other than that.

22         MR. JUAREZ:  Well, there may be some, but some are

23   kept locked up like the case I referenced from the Ninth

24   Circuit dealing with this particular enhancement under lock and

25   key, guards, things of that nature.  Obviously, we're not         10:37:11

```
 1    talking about that here.  Now, the Court references the number
 2    of hours the victim was in the house.  She wasn't working.
 3    Yeah, she was there in the house.  It wasn't like she was there
 4    hard labor or things of that nature.  Now, obviously, she felt,
 5    and I know that the Court -- and I agree with the Court this is        10:37:34
 6    an illegal contract.  You can't ever enforce it in law.  But
 7    someone gives your word, I'm going to do this for you for three
 8    years and they feel compelled to honor that, which I think was
 9    a large part of this, that there was an agreement that she was
10    going to work for them and she was going to do that.  But as          10:37:53
11    far as my client saying no, you can't go until -- unless you
12    pay this amount, the telephone call between Andres and Mr.
13    Nogales seems to suggest she but wasn't privy to that.  What I
14    got from the narrative was you can leave, but you are going to
15    have this debt.  You can go out and work.  I wouldn't suggest         10:38:16
16    that because, basically, Ms. Perez is an older version of the
17    victim.  She also came from that sort of background.  She also
18    was dirt poor.  She also -- she, herself, faced a lot of that
19    hardship coming to the United States.  She was -- luckily got
20    married to Mr. Andres.  He then started providing for her and        10:38:38
21    she started having babies.  She would recount her experience,
22    and I think the Court knows that she had a fairly harrowing
23    experience coming to the United States.
24         So when I say that's a complex situation, these ladies
25    would talk and the victim -- and the way I got it, being very        10:38:57
```

1    impressionable, would take that to mean certain things.  But

2    even in the narrative she gave, she agreed Ms. Perez never told

3    her if you don't pay you are going to get hurt.  They never

4    threatened her physically.  None of the doors were locked.  She

5    was free to walk around.  I know the *Dann* case --          10:39:20

6            THE COURT:  She was told if she left they had people

7    to find her, bring her back, and make her work off her debt.

8            MR. JUAREZ:  My client disagrees that that statement

9    was made.  That's part of our disagreement with that.  The

10   victim took it, apparently, in that tone.  But again, when I    10:39:40

11   look at this, I think she was just hearing stories about people

12   that any illegal alien, undocumented alien group will discuss

13   their experience, the experience they have heard from people,

14   things of that nature.  Now, I know the government is

15   indicating, or has some evidence they think proves that Mr.     10:40:05

16   Andres was involved in trafficking possibly, but my client was

17   not involved in that area.  And they certainly weren't rich.

18   They were barely making their payments and barely getting

19   along.

20           So anyway, Your Honor, I have -- I think I have         10:40:21

21   addressed the -- our objection to that enhancement.

22           THE COURT:  Hold on just a minute.

23           (Discussion off the record.)

24           THE COURT:  All right.  Mr. Juarez.  Go ahead.

25           MR. JUAREZ:  I'm done, Your Honor.                      10:43:30

```
1          THE COURT:  Okay.  And Mr. Baggot, do you want to say

2     anything on that point before we hear from the government?

3          MR. BAGGOT:  What is the point again, Your Honor?

4          THE COURT:  What's the point, Mr. Juarez?

5          It's the enhancement of 2L1.1(B)(8)(a) for an alien          10:43:44

6     involuntarily detained in connection with a demand for payment.

7          MR. BAGGOT:  That's my objection to Paragraph 47,

8     yes.  Not to repeat the memo, Your Honor, the question is what

9     is meant by involuntary detention in connection with demands

10    for payment?  The only note I could find is Note 6 which refers   10:44:06

11    us to 2A1.1, as I remember, and that refers us to the general

12    definition which requires detention in a more physical sense

13    requiring actual restraint of a person in the physical sense.

14    The case Mr. Juarez presents from the Court, *Gamez-Perez*, I

15    think, it is, or *Reyes*, talks about guards and bars on the     10:44:28

16    window and locked doors and people, actually bulky people,

17    standing around so they can't run off.  The forced labor

18    statute deals with more psychological pressures than physical

19    restraint.  And what we submit is that this is, Paragraph 47,

20    is not meant to be a forced labor type of a situation.  It       10:44:50

21    doesn't refer to psychological pressures or social pressures.

22    It doesn't refer to any harm.  It's talking about restraint in

23    the physical sense.  And indeed, 1B1.1 which is -- .3, I think,

24    which is the general definition, does talk about restraints and

25    that requires a more physical type of restraint.  And we submit   10:45:12
```

1    that's what they are talking about here.

2          THE COURT:  What about the text?  It says, quote, "was

3    involuntarily detained through coercion or threat or in

4    connection with demand for payment."  Now if it's enough to be

5    involuntarily detained through a threat, that would seem

6    clearly not to require actual physical restraint.  So that

7    seemed undercut.

8          MR. BAGGOT:  Doesn't say threat of what?  That's the

9    question.  If you threaten not to pay someone you threaten in a

10   nonphysical sense.  We submit that what -- what that's talking

11   about is actual physical restraint, which would stay in the

12   typical drop house case.

13         THE COURT:  That would obviously be included.  But it

14   seems like that has to be broader than that, because coercion

15   or threat, coercion would suggest physical constraint, but a

16   threat could be anything that causes a reasonable fear of

17   serious consequence.

18         MR. BAGGOT:  But she said throughout her testimony

19   that there was no harm done to her, no threat to her

20   whatsoever.  This was a voluntary decision to keep her word,

21   which is a commendable thing for the girl to do.

22         THE COURT:  Anything else?

23         MR. BAGGOT:  No.  That's all.

24         THE COURT:  Let me hear from Ms. Stoddard on that.

25   This is the key thing here, is to -- we don't really have much

10:45:29

10:45:51

10:46:08

10:46:25

10:46:39

```
1    here But what does involuntarily detained mean?  And
2    ironically, the passage I already read from forced labor is
3    broad and would seem to cover at least the government's view
4    and the presentence report writer's view of the evidence here.
5    But that might be broader than this guideline.              10:47:11
6            So what's your answer?
7            MS. STODDARD:  Yes, Your Honor.  It is the
8    government's position that, essentially, psychological, mental,
9    or threatening and coercive behavior is sufficient to warrant
10   the enhancement in this case, that there is no need for      10:47:28
11   physical handcuffs or physical restraint or physical beatings.
12   Looking at the plain language of the enhancement itself and
13   saying coercion or threat or demand for payment, all of these
14   are, in themselves, could be just verbal acts or threatening
15   acts or psychological pressure.  It nowhere here says physical 10:47:46
16   pain, physical injury, assault.  It doesn't even actually say
17   threat of an assault, which I see in assault with deadly weapon
18   cases all the time.  So the guideline offers no help as to how
19   to include language to include physical violence or threats of
20   physical violence.  The language in here simply deals with     10:48:07
21   coercion and threats and demands for payment which the
22   government does believe has been absolutely sufficiently
23   established both from Ms. Perez-Cos under a clear and
24   convincing standard and also for Mr. Andres under the lower
25   preponderance of the evidence standard.                        10:48:23
```

1       The narrative that seems to be being presented is that

2   this victim and Perez-Cos, it was some type of female cat fight

3   and they were women that did not get along.  And that is not

4   the situation that occurred here.  This was a young, naive,

5   uneducated girl who came here because she thought it's what she        10:48:43

6   had to do for her family.  They are trying to say that she

7   misinterpreted things or that she was so imprisonable she

8   didn't understand what was being communicated to her.  She took

9   things the wrong way.  But it's hard to take the wrong way

10  being told which what prison should I send you to, you are          10:48:59

11  trash, men are going to throw you in the trash.  Even having

12  her watch over other aliens that were being held, putting their

13  burden on her saying if these people escape, their debt is on

14  you.  That is on you.  That is an absolutely concrete act

15  showing her that if she tried to get away.  She said in her          10:49:17

16  narrative she didn't know what would happen to her.  She didn't

17  know if they would throw her in prison.  She didn't know if she

18  would be hurt.  She didn't know if she would be brought back.

19  She had no idea what would happen to her.  All she knew was

20  that if she tried to get away they had people that would find        10:49:30

21  her.  And it was only until -- I guess it was a silver lining

22  of a very bad situation that she met the people through

23  Catholic Charities.  And in her interview she said I finally

24  realized there were people that would help me.  I didn't know

25  that.  She didn't know that there were people that would help          10:49:47

1    her, and that's why she stayed.

2           When she was told by Mrs. Perez-Cos, oh, you can leave

3    if you pay $1,000 you can leave.  It was wasn't you are free to

4    leave and go free.  It's you owe me money.  If you give me this

5    money then you can leave.  She didn't have any money.  Her          10:50:02

6    family didn't have any money.  They let alone the money that

7    was supposed to be send to them they weren't accruing, she had

8    nothing.  Everything was dependent on them, her clothes, her

9    food, the roof over her head, everything was dependent on them.

10   She did not have the ability or knowledge to make her own money    10:50:17

11   to try and save it to get out from the situation.

12          When her brother-in-law, who is a grown adult man

13   living in the United States, much better abilities and freedoms

14   than she had, when her brother-in-law contacted Mr. Andres

15   offering to give money to give her release he was denied.  When   10:50:36

16   he continued to press the issue and tried to negotiate a price

17   and offered to give money so she could get out, he was

18   threatened.  This is not a situation where she felt she was

19   free to come and go and do what she pleased.

20          And so the government does believe that the sentencing      10:50:50

21   enhancement is warranted in this case and has been shown by the

22   appropriate evidentiary standards for each defendant.

23          THE COURT:  Ms. Stoddard, as I said, it appears that

24   the standard under the forced labor statute, it's much easier

25   to conclude that it does apply.  And this comment may go more      10:51:11

1    to Mr. Andres, but it is your responsibility to defend this

2    plea agreement.  I don't see why you are dismissing Count 2 and

3    why I shouldn't reject the plea agreement at least as to Mr.

4    Andres on the grounds that it does not adequately reflect the

5    seriousness of the offense conduct when it's classic human          10:51:35

6    trafficking.  He arranged to import her.  She had no practical

7    ability to do anything about it.  There was clear psychological

8    coercion, ultimately sexual exploitation, a pregnancy, with a

9    person who had no language skills, no money, no friends, no

10   resources.  Classic human trafficking for labor for, depending    10:52:00

11   on how you count, 5 to 25 cents an hour.

12          So it's your job to persuade me that I should accept

13   that plea agreement.  And tell me why, at least as to Mr.

14   Andres, this plea agreement adequately reflects the seriousness

15   of his offense conduct.                                            10:52:24

16          MS. STODDARD:  Understood, Your Honor.

17          I can tell you that negotiations in this case, the

18   government did not make this plea offer lightly.  We strongly

19   considered what was the most appropriate plea offer to try and

20   punish not only this defendant personally but also to address     10:52:45

21   the conduct globally as far as the recidivism or deterrent type

22   factor.  Also what strongly weighs in the consideration is the

23   impact on the victim that a trial would have.

24          THE COURT:  I want to know about that.  She's been --

25   she's paroled in now or what's the technical term?                 10:53:10

1          MS. STODDARD:  She's actually here in the courtroom.

2     She's here, my understanding, is on a temporary basis during

3     the pendency of the proceedings.  After that point --

4          THE COURT:  I know it's always painful for any victim

5     in any case to testify, but I'm not seeing anything specific          10:53:25

6     here that would be a trauma rather than a catharsis for this

7     victim if she has to testify.  And if you have something

8     specific, you need to tell me.  If you are just talking in

9     general, I understand that.

10          MS. STODDARD:  To be perfectly candid, this is the          10:53:46

11     first time she's been in a federal courtroom.  She wasn't sure

12     she was going to be able to make it here today because she was

13     scared.  Understanding the issues that have been brought out

14     here in this sentencing, I anticipated what her

15     cross-examination would be.  More specifically, I anticipated          10:54:03

16     the cross-examination of what she feels was the rape by Mr.

17     Andres.  I understand that is not charged as rape or sexual

18     assault, and I completely legally understand that.  To her, she

19     feels it a different way.

20          She is a very private girl, a very private woman, who          10:54:19

21     was completely shamed by the fact that this sexual relationship

22     occurred.  And for her to testify in trial about it and to be

23     cross-examined about it and have her family, who to date is not

24     specifically aware of everything that occurred with that

25     relationship and with the pregnancy and with the baby would          10:54:38

```
 1    have been devastating to her.  She is in a much better place
 2    emotionally and psychologically than when she got out of that
 3    house.  And to put her through the trial and to put her family
 4    in the courtroom and have them here and have all of that
 5    exposed would have been extremely traumatic to her.  And so we      10:54:55
 6    tried to strike a balance of -- for example, that's why in Mr.
 7    Andres' plea agreement we specifically stipulated to the
 8    serious bodily injury enhancement to try and hold him
 9    accountable more than Ms. Perez-Cos but applying that
10    significant enhancement for the pain and for the actual            10:55:13
11    physical injury that the victim suffered during the pregnancy,
12    holding him accountable to a higher level because we do
13    recognize a difference in culpability between Ms. Perez-Cos and
14    Mr. Andres.
15         THE COURT:  On the other hand, his four-level                 10:55:31
16    enhancement for bodily harm doesn't actually matter, because it
17    just duplicates the enhancement for involuntary detention.  It
18    doesn't add one level to his guideline calculation.
19         MS. STODDARD:  And I recognize that.  It was more of
20    the benefit to the victim in having her know that what happened    10:55:49
21    to her was being acknowledged.
22         THE COURT:  Well, I know your victim advocate people
23    deal with victims, and I am confident they are able to explain
24    to them that sometimes terrible things happen to someone,
25    terrible things for which people feel that they are the           10:56:16
```

1    loneliest person in the world, that no one knows or cares

2    what's happening to them.  But in our country, the law and the

3    courts do care.  And there is a fairness in the process.  One

4    has to be able to testify truthfully, but the process itself

5    deserves trust from victims.  And if the victims are not          10:56:49

6    willing to come forward then justice isn't really done.

7           So I hope that your people, your victim advocacy

8    people, can explain to her that the terrible things that

9    happened to her are not a cause for her to be embarrassed.

10   They are a cause for her to see how she was victimized by other   10:57:13

11   people.  And she should not feel embarrassed for what other

12   people did to her.

13          So anyway, and I say that not for this case, I say

14   that for every case.  So it comes back to the question of what

15   appears to be under, you know, as I -- this is a relatively new   10:57:40

16   statute, the forced labor statute.  But as I studied it and

17   looked at it for this case also, that statute is aimed to be an

18   effective deterrent to human trafficking.  And it recognizes

19   the diverse ways in which people are victimized who have less

20   than free choice working off, I suppose, a debt is one.          10:58:12

21   It's -- sometimes this is done by large organizations.  Here

22   it's done by just a husband and a wife exploiting their own

23   countrymen.

24          But I read that statute as providing effective

25   meaningful deterrence to people who would exploit labor that's    10:58:33

1    less than free.  It has to be -- meet the standards.  But as I
2    said, it appears that the standard here is readily met.  And
3    the fact that the victim here was frightened, uninformed,
4    alone, had no sense that she could do anything or anyone would
5    do anything for her doesn't -- and as I read this statute, it          10:59:10
6    does not negate the liability.

7         So anyway, I need to hear also from Mr. Baggot about
8    this.  So Mr. Baggot, tell me why I should not reject the plea
9    agreement as to Mr. Andres, and perhaps we'll have a trial.
10   The victim will be welcome to remain in this country as long as       10:59:44
11   necessary to process that case.  And if we did that, we really
12   would eliminate the need to debate about the meaning of this
13   enhancement for simply harboring for profit, for financial
14   gain, because we'll have a forced labor case in which, again,
15   it appears to be readily satisfying.                                   11:00:12

16        Mr. Baggot, tell me why I shouldn't reject the plea
17   agreement as to Mr. Andres.

18        MR. BAGGOT:  Well, Your Honor, first of all, the
19   government has the right to dismiss any charge which they wish
20   under Rule 48 whether the Court likes it or not, with all due         11:00:24
21   respect.

22        THE COURT:  If I reject the plea agreement the
23   government will decide then whether it wants to dismiss other
24   charges.

25        MR. BAGGOT:  Yes, but they do have the right to do              11:00:32

1    that.

2            THE COURT:  And the defendant can plead guilty to this

3    charge for which there is a 10-year statutory maximum sentence.

4    He will have the right to plead guilty to that.

5            MR. BAGGOT:  Yes, he does.                        11:00:42

6            Your Honor, first of all, we question your basic

7    premises.  The girl was not working 15 hours a day.  She was in

8    the house, yes, but this is a small house.  There's -- it's not

9    a big house.  She -- the evidence is she's out in the yard

10   playing with the children.  They go to church together.  They    11:00:59

11   go shopping.  The girl and the wife went shopping.  They had

12   disagreements over the clothes.  The girl wanted more

13   boy-attracting type clothes and the wife wants more traditional

14   Guatemalan looser clothes, things like that.

15           So you can't really equate this to someone who is        11:01:19

16   working in a mine or on a ship or something like that, you

17   know, actually working all that time.  She also got additional

18   benefits that she was fed, clothed, housed, taken care of.

19   She -- I'm sure she watched television a good part of the time.

20   So she had many other benefits in addition to what the Court     11:01:39

21   stated.

22           We just feel that the letters which we submitted in

23   support showed that the people who saw the family, extended

24   family together saw nothing wrong with the girl being part of

25   this family with the five other children.  She was sort of like  11:01:57

UNITED STATES DISTRICT COURT

the sixth child, more than an immigrant nanny, which she was

supposed to be.  And they spent a lot of time with her trying

to instruct her how to use things.  She didn't even know how to

use a shower curtain, and that's really basic, when she first

started.                                                          11:02:17

        So we submit that it is cheap labor in a sense, but

many immigrants are very happy to cross the border and come and

do domestic work.  And it's a very common thing and most

domestic work doesn't pay very much anyway.  If you go to a

hotel you will hear Spanish in every corridor.  I won't comment  11:02:37

if they are legal or not.  In any event, many domestic labors

do come from South America and Central America, and it's

nothing unusual in this case.

        And we'll also point out under the discovery, he

treated her quite well to begin with.  He didn't have the        11:02:53

personality conflicts and the frustration the wife did.  He

stood between -- he took the girl's side against the wife many

times.  They got along very, very well, perhaps too well that

they finally got together in the physical sense, and they

continued their relation even after the first incident.  There   11:03:12

was -- they just got along too well, actually, is what it is.

        So we submit that the government's decision to dismiss

the forced labor charge is a good solid decision.

        THE COURT:  Well, the concern the government's

expressed is the usual concern about the emotional pain to the   11:03:35

victim from testifying, also embarrassment and shame.  And as I

have said, there is no shame in being a victim.  And there

should be no embarrassment in standing up for justice against

someone who exploits the weak and the poor.  Other than -- I'm

not really seeing or hearing any serious weakness in the

government's case if one takes the view that, well, that the

forced labor statute is meant to punish more than just false

imprisonment and working under physical detention.  And I think

the statute is meant to strike a major blow at a widespread

abuse of the weakest and poorest people who get into our

country.  So I'm not seeing a weakness in the government's

case.  I do give weight to the desire of any victims to get

something behind them in their life.

    Well, let me suspend that discussion and let us return

back to Ms. Perez-Cos.  The plea agreement for her caps at a

sentence of not more than 18 months in prison.  And even though

in light of what appears to be her obvious awareness of what is

going on, what was going on, and even participation in some of

the discussions that reveal that, even without a conviction of

forced labor, a sentence of not more than 18 months may well be

sufficient so that it may even well be appropriate to accept

her plea agreement even if I do not accept the plea agreement

for Mr. Andres.

    The complication about that is -- and that brings me

back to this specific offense characteristic.

1          Ms. Stoddard, have you looked at the cases?  Are there

2     any cases on what involuntarily detained means?  I mean, I know

3     there's cases out there on extreme cases but extreme cases

4     don't set the lower boundary.

5          MS. STODDARD:  Right.  I looked and I couldn't find          11:06:39

6     anything addressing more of this situation, Your Honor.  I

7     mean, the cases I found are things defense counsel have talked

8     about setting the very extreme of, you know, cuffs and being

9     kept in rooms and things like that.

10          THE COURT:  Well, it does appear that Ms. Perez-Cos          11:07:11

11     would also share easily in the liability for the forced labor

12     charge but that, as I said, may exceed what would be a

13     necessary sentence for her.

14          And the problem is if I proceed, this question of the

15     involuntary detainment looks to be like a debatable question.          11:07:53

16     I'm inclined to read it the government's way to take

17     voluntariness in a practical way in the context of a demand for

18     payment and threats.  But it may be a debatable question.

19          So if I accept the plea agreement, grant that

20     enhancement and sentence at the higher -- well, actually, what          11:08:26

21     would the -- if that enhancement is overruled, then the

22     guideline range would be 6 to 12 months.  Of course, there's no

23     agreement with respect to Ms. Perez-Cos that the sentence be

24     within the guideline.  The government agrees to recommend a

25     sentence at the low end.  There's a cap at 18 months.          11:09:20

1      MR. JUAREZ:  And a stipulation to a cap of 18, Your

2  Honor.

3      THE COURT:  Right.  So maybe another way to come at

4  this is it is persuasive to me, and readily so, that Ms.

5  Perez-Cos had ample awareness of this ongoing exploitation,     11:09:46

6  fear, and inability of the victim, as a practical matter, to

7  have the free choice and the option to free herself from this

8  situation.

9      Well, I have gotten a bit out of sequence of the way I

10  usually address things.  This comes up on the objection.  Tell    11:10:22

11  you what.  On balance, I'm persuaded to overrule the objection.

12  However, when we get to the allocution with respect to Ms.

13  Perez-Cos it might turn out, I don't know, that the sentence I

14  arrive at will render it of no consequence whether that

15  objection is sustained or not.  So for now, my best read is     11:11:06

16  that the involuntary detention is adequately met in the

17  circumstances of this case, so that objection is overruled.

18      Are there any other objections, Mr. Juarez?

19      MR. JUAREZ:  No, Your Honor.

20      THE COURT:  And Mr. Baggot?     11:11:23

21      MR. BAGGOT:  Well, just as stated in the memorandum.

22      THE COURT:  Well, actually, I'm asking you to tell me

23  what they are.

24      MR. BAGGOT:  Number one, to the two-level enhancement

25  as to Mr. Andres; and number two, as to penalizing him for the     11:11:34

```
1    charge that was dismissed, the forced labor.

2         THE COURT:  That's the point I just discussed earlier.

3    I took your comments as not asserting that.  If you do wish to

4    assert that then I'm going to grant your client leave to

5    withdraw from the plea agreement.  Because the way I'm taking      11:11:54

6    it, your client waived that, or if he wasn't conscious of

7    waiving it I'm going to protect him by allowing him to withdraw

8    from the plea agreement.  So you cannot have it both ways.  You

9    cannot assert that the Court cannot consider this enhancement

10   and stick with the plea agreement.                                 11:12:12

11        So I protect your client either way.  He's either

12   waived it, or if he has any misunderstanding he may withdraw

13   from the plea agreement.  Do you want to confer with him about

14   that?

15        MR. BAGGOT:  No.  We want to stick with the plea             11:12:29

16   agreement.

17        THE COURT:  Are you disputing my interpretation that

18   you waive the objection that the dismissal of Counts 1 and 2

19   preclude the Court from assessing the enhancement under 2L1.1?

20        MR. BAGGOT:  It's still relevant conduct that the           11:12:43

21   Court can consider.

22        THE COURT:  I'm taking that again as a waiver of the

23   objection you made and you just restated a minute ago.

24        MR. BAGGOT:  Yes.  We waive it.

25        THE COURT:  All right.  If there's no other                 11:12:56
```

1    objections, I will proceed with Ms. Perez-Cos at this time.

2            So Mr. Andres, if you would like to take -- actually,

3    he has to remain here to hear the interpreter.

4            So all right.  Ms. Perez-Cos.

5            THE INTERPRETER:  Excuse me for a minute, Your Honor.    11:13:46

6            THE COURT:  Yes.

7            All right.  The defendant, Ms. Perez-Cos, has pleaded

8    guilty before the magistrate judge, and the magistrate judge

9    has recommended that the Court accept the guilty plea.  The

10   Court will accept the defendant's guilty plea.              11:14:05

11           There having been a determination of guilt by virtue

12   of the defendant's guilty plea, it is the judgment of the Court

13   that the defendant is guilty on Count 4 of harboring an alien

14   for private financial gain, aid and abet, in violation of Title

15   8, United States Code Section 1324(a)(1)(A)(iii),          11:14:27

16   (a)(1)(A)(5)(ii), and (a)(1)(B)(i).

17           The Court will accept the plea agreement and the

18   judgment and sentence will be consistent with it.  I am

19   satisfied that the plea agreement adequately reflects the

20   seriousness of the actual offense behavior and that accepting   11:14:47

21   the agreement will not undermine the statutory purposes of

22   sentencing or the sentencing guidelines.  And I specifically,

23   even though the defendant, that Counts 1 and 2 will be

24   dismissed with respect to forced labor, the Court finds that

25   with respect to Ms. Perez-Cos, the plea agreement does     11:15:09

1    adequately reflect the seriousness of the that conduct as well.

2    And the stipulated sentence cap is within the applicable

3    guideline range, as is the defendant's -- or the government's

4    recommended sentence.

5            Again, as to Ms. Perez-Cos, the Court finds the          11:15:35

6    offense level computations, the total offense level, the

7    defendant's criminal history category, and the applicable

8    ranges are as stated in the presentence investigation report.

9            Now, and Mr. Baggot, since I am going to speak to your

10   client, would you come up to stand next to him.               11:16:08

11           With respect to you, Mr. Andres, I'm going to reserve

12   making a determination of guilt on Count 4 and on making a

13   decision whether to accept the plea agreement until after I

14   have heard the allocution of both parties to give the maximum

15   opportunity to weigh that.  And if I do accept the plea       11:16:30

16   agreement then I will enter that, make that determination and

17   accept it.

18           So at this time, let us proceed with the allocution

19   concerning Ms. Perez-Cos.  Now, Mr. Juarez, would you prefer to

20   allocute first or after the government?                       11:16:50

21           MR. JUAREZ:  Your Honor, I don't mind going first.

22           THE COURT:  Go ahead.  That includes your Motion For

23   Downward Departure.

24           MR. JUAREZ:  Yes, Your Honor.  May I -- I know there

25   was at least one person who wanted to speak on her behalf.    11:17:07

1          THE COURT:  Certainly.

2          MR. JUAREZ:  This is Ms. Nora Mendivil, Your Honor,

3     from Ms. Perez's church.

4          THE COURT:  You may speak into the microphone, please.

5          MS. MENDIVIL:  Hi.  My name is Nora Mendivil.  And I        11:17:59

6     am a member from the church, christian church center in Mesa.

7     Ms. Elizabeth is member, too.  And sir, with my respect for

8     you, I want to tell you Ms. Elizabeth and Mr. Javier, I'm

9     concerned that I have a good testimony but is a good persons.

10    I know both from a couple years ago.  And I just know his        11:18:48

11    family is a good family.  I know all the children she have and

12    I know this faith affect his childrens.  Because those

13    childrens is together.  This family, I'm concerned that if they

14    come out of here, they have good relations together and the

15    church too, because he never chose to stay like a victim, like   11:19:57

16    a victim person.  Because I see at different times, most of the

17    time, because they come together to the church.  And they

18    looked like a happy person and have good relation with the

19    children.

20         And I just know Ms. Elizabeth and Mr. Javier, they          11:20:34

21    have good feelings.  And because he showed to me, in different

22    times because I live by myself in a difficult situation.  I

23    need assistance like food and I need assistance.  He called me

24    one time when and he helped me to send me the necessary stuff

25    like the food, and he bring he a refrigerator and come over to   11:21:18

```
1    when I need to cook.  And that's only what I want to tell you.
2    Think about it.  But I promise when I tell you, from God.  And
3    only my petition is for you, please touch your heart because
4    they only affect persons here in this situation.  That's the
5    childrens.  And the childrens, all they stay together all the      11:22:05
6    time.  And one from the other, you don't stay separate, because
7    it's the children, all together, the family together is a
8    wonderful family.  And please I want to tell you I need in
9    church Mr. Elizabeth, because is a person, a leader for the
10   woman's, and we need someone in that church and we need the        11:23:12
11   kids together, too.  Thank you, sir.  God bless.  Thanks for
12   your time.
13            THE COURT:  Mr. Juarez.
14            Mr. Baggot, let's have Mr. Andres come up so he can
15   hear the translation as well.                                      11:23:53
16            MR. JUAREZ:  Thank you, Your Honor.  I believe the
17   Court can get a sense of Ms. Mendivil, who expressed the
18   sentiment of herself that -- that Ms. Perez-Cos, who was an
19   integral member of the ministry of that church, that the victim
20   very often accompanied them to the church, and that from all       11:24:33
21   accounts from the members, that she did not appear to be
22   suffering or under any duress of any kind.  And it also shows
23   an indication of Ms. Cos-Perez to integrate the victim into the
24   family.  So it was a situation where the Court addresses the
25   forced labor which tends to dredge up concepts of, you know,       11:25:02
```

```
1    physical restraint and physical --
2             THE COURT:  You know, even if my rough numbers are off
3    by a factor 10, she was working for 50 cents an hour.  I
4    suspect my numbers can't possibly be off by more than a factor
5    of two or three.  So she's working for 10 or 15 cents an hour.    11:25:26
6    That's what they all do.
7             MR. JUAREZ:  Ms. Perez is not here to say that she
8    didn't violate the law.  She did violate the law.  What we're
9    saying is that it was a situation that initially was prompted
10   by the fact that she just desperately needed help.  And it was    11:25:48
11   in that situation that the victim was brought over to help.
12   And it was the intent of Ms. Perez to not treat her unkindly.
13   It was never her intent to do that.  However, apparently, it
14   was a situation where the victim felt that she was being
15   treated unfairly by Ms. Perez.                                    11:26:16
16            THE COURT:  But Mr. Juarez, the best you can say about
17   this for Ms. Perez-Cos is that she knowingly harbored an
18   illegal alien that she knew her husband imported to work for 10
19   or 15 cents an hour.  That's the best you can say.
20            MR. JUAREZ:  Yes, Your Honor.  But with respect to a     11:26:43
21   sentence for Ms. Perez, what she's facing and what she's faced
22   during these various months go well beyond any prison sentence
23   that this Court can impose on her.  Obviously, she's been
24   incarcerated now for the past seven or eight months.  As I
25   indicated in my memorandum, and as Ms. Mendivil indicated, she    11:27:02
```

1   isn't the only one suffering through this process, neither was

2   the victim, but her minor children.  They are all a very close

3   family.  They always did things together.  One day they are

4   yanked apart and for these past several months she hasn't been

5   able to talk to them.  I don't know why that was and I don't          11:27:27

6   know why that was impossible to arrange.  Certainly we have

7   tried to expedite or assist with that.

8        But so here are these minor children who are, for her

9   involvement in this offense, been going through this ordeal.

10  She's faced with prospects of losing those children.  I'm told      11:27:43

11  by the Child Protective Custody attorney who was -- excuse

12  me -- the state attorney who was assigned to represent her that

13  grounds for severance of parental rights if she gets a sentence

14  of a year or more would be grounds.

15       THE COURT:  That doesn't mean they will pursue that.           11:28:09

16       MR. JUAREZ:  And that would be a terrible tragedy

17  under the circumstance, Your Honor, and I would ask the Court

18  to obviously consider the fact that prison time is probably the

19  least of what Ms. Perez is going to be suffering from as a

20  result of her offense in this case.                                  11:28:33

21       THE COURT:  Well, she will be deported.  But will she

22  take the children back to Guatemala or leave them here?

23       MR. JUAREZ:  That's what they are trying to arrange

24  now.  I'm told that if he's released to Guatemala there's

25  arrangements made to transfer custody to her in Guatemala, and      11:28:50

1     although they are U.S. citizens they are also her children, so

2     she has a right to have them.  So the State prefers keeping the

3     family together, obviously.

4         THE COURT:  Once she is released from custody, she's

5     the mother.  She'll have custody.  Well, DPS has removed them    11:29:15

6     because of dependency.  I suppose there are further

7     proceedings.  But if she is out of prison, she's the mother,

8     there's been no neglect of the children other than being in

9     prison.

10         MR. JUAREZ:  Right.  She never -- for all intents and    11:29:31

11     purposes, she's been an excellent mother, excellent caretaker

12     for her children, just the circumstances she finds herself

13     here.  So she's been agonizing for these several months about

14     that.  And she will be deported.  She can't ever come back.

15     She's an aggravated felon.  If she comes back she's going to be    11:29:49

16     facing multiple years.  We all know and she understands that.

17         So for those reasons, also the reasons I have

18     indicated in my motion, Your Honor, I would ask for a sentence

19     of time served.  For a person who has never spent a day in

20     prison, all this time that she's been there, she's always shown    11:30:13

21     herself to be -- have a strong faith in God.  She -- it was

22     very important for her to have religion in her life and her

23     children.  Despite what's been -- how this offense has come

24     across as far as attacking her character, she's always

25     demonstrated herself to be a very caring, nurturing type of    11:30:41

1    individual.  And she's also been a very good, positive

2    influence in the community.

3            So I would ask the Court to consider all that in

4    sentencing.

5            THE COURT:  Ms. Stoddard.                              11:30:57

6            MS. STODDARD:  Yes, Your Honor.  As the Court has

7    indicated, it's accepted the plea agreement.  We are

8    recommending a sentence, as indicated in the plea agreement, to

9    the low end of the guideline range.  We did take into

10   consideration the fact that this defendant has no criminal        11:31:07

11   history.  Obviously, she's in the country without status.  But

12   she has no arrests, no prior police contacts, nothing of that.

13   It seems that she was here and essentially just focused on her

14   family and church and things of that nature.

15           So it's believed a proposed sentence of 18 months will   11:31:24

16   be a sufficient sanction any very significant sanction for this

17   defendant who, up until this case and this point, has never

18   been in custody.

19           We're also cognizant of the fact there will be a

20   significant change in her life.  She's been here for about a     11:31:37

21   decade and now she's going to be deported back to Guatemala

22   which will be a large change in her life, which obviously is

23   warranted but also is something when considering just

24   punishment and the effect of the sentence on this case and the

25   defendant going forward in the future.                           11:31:56

1        We are asking for maximum available term of supervised

2   release for three years just to further hopefully motivate the

3   defendant not to try to return to the United States without any

4   legal authorization.  As indicated, there's not any restitution

5   being requested, neither from the victim or from any type of        11:32:11

6   agency or healthcare or thing of that nature.

7        THE COURT:  I take it that's because they don't think

8   there's any prospect of collecting any money because they will

9   both be deported.

10       MS. STODDARD:  I would think that's quite likely.           11:32:27

11       THE COURT:  Other than that restitution would be

12  obviously warranted in a very large amount, two and-a-half

13  years of worth of work, whatever cautious conservative

14  estimates the would be.  All right.

15       Now, I am concerned about Mr. Juarez's comment about       11:32:44

16  whether Child Protective Services might seek to terminate

17  parental rights.  On the one hand, that's not my area of

18  expertise; on the other hand, she will be out of prison soon.

19  It would seem quite unlikely that they would seek to terminate

20  her rights when there has been no neglect of the children other   11:33:09

21  than being involved in this crime and ending up in detention.

22       So the question comes down to, well, if we touch on

23  the statutory purposes sentencing, they are the nature and

24  circumstance of the offense, and closely related to that is the

25  need for the sentence to reflect the seriousness of the          11:33:33

offense, to promote respect for the law, and to provide just
punishment.  And Ms. Perez-Cos was directly involved in the
knowing, illegal bringing into the country of a person to do
what amounts to slave labor, to work off an illegal contract.
And even if one who is deeming that illegal contract something          11:33:57
payable, no matter how you evaluate this work, she was working
for 50 cents to a dollar an hour, promising to pay her mother
though largely not met.

So this is, in my view, when we get to Mr. Andres is
more serious.  But with respect to Mr. Perez, this is a classic        11:34:22
example of people who are trafficking in what amounts to the
practical equivalent of human slavery, bringing people in
illegally, concealing them, working them for two and-a-half
years for essentially nothing.

Now, that's behavior that is done for financial                 11:34:41
benefit.  And people who commit crimes for financial benefit
are usually able to think through the cost and the benefit.
Well, I could do this, I will save a lot of money for
childcare, but I might go a prison.

This touches on another purpose of sentencing, which           11:35:09
is the need for the sentence to afford adequate deterrence.
The question here primarily is one of public deterrence.  Ms.
Perez-Cos, you will be deported to Guatemala.  But the question
here is, what is necessary to communicate to the public in
general people who have the opportunity and the will to, in            11:35:31

```
1    effect, deal in human trafficking because it saves them money.

2    What consequence needs to be out there, public, that shows

3    people no, we are a society that abhors that, puts serious

4    consequences on it, and will punish people who indulge in it,

5    especially when you are exploiting the weak, the uneducated        11:35:58

6    people who are powerlessness, brought into this society from a

7    different culture.

8         So I view the need for public deterrence here to be a

9    serious consideration.  And that extends also to Ms. Perez-Cos

10   even though it's a much more serious matter for Mr. Andres.         11:36:19

11        MR. JUAREZ:  Excuse me, Your Honor.

12        THE COURT:  Yes.

13        MR. JUAREZ:  I don't mean to interrupt the Court.  Ms.

14   Andres -- Ms. Cos wanted to say a few things also.

15        THE COURT:  You are right.  We have been going for two        11:36:33

16   hours.  Thank you for the reminder.

17        So Ms. Perez-Cos, you have the right to speak, and I

18   apologize for forgetting that.  You are welcome to say anything

19   you would like.  You don't have to say anything, but you are

20   welcome to say anything you would like before sentencing.          11:36:50

21        So is there anything that you would like to say to the

22   Court before sentencing?  Take your time.

23        DEFENDANT PEREZ-COS:  Yes.  I am very remorseful for

24   all this harm that was caused.  But more than anything, I feel

25   so ashamed because I caused damage to my children.  And people     11:37:28
```

 1    who love me and my family who suffered is suffering.  And that

 2    hurts me very much, and I am so sorry.  I love my children so

 3    much.  My children are my life.  They are everything I have.

 4    And I ask Your Honor for just one opportunity that you will

 5    give us.  And that's all.  Thank you.                          11:38:15

 6             THE COURT:  All right.  I have considered that, and

 7    although I do believe a sentence at the low end of 18 months is

 8    warranted here, I'm going to impose a lower sentence for a

 9    couple of reasons.  First, I have made my best ruling with

10    respect to this enhancement.  However, in giving my sentence I  11:38:51

11    am going to sentence to the same sentence I would if I had

12    disallowed that enhancement.

13             So I intend, even though my judgment is that

14    enhancement does apply, in my discretion I am going to give the

15    defendant the benefit of removing that enhancement in her       11:39:17

16    situation.  I think the chances of Child Protective Services

17    seeking to terminate Ms. Perez-Cos's parental rights are very

18    remote, but because I do not have expertise in that, I'm going

19    to take you at your understanding, Mr. Juarez.  And I'm going

20    to give a sentence that will avoid that.                        11:39:39

21             So the sentence I, as a practical matter, the sentence

22    I intend to give and would give is a sentence of 12 months

23    which is the low end of the guideline if the enhancement is

24    sustained.  That still triggers your concern with the

25    Department of Child Protective Service.  So here's -- and       11:40:00

```
 1    indeed, I would give a sentence of 12 months and one day, but
 2    that still leaves it.  So instead, Ms. Perez, I'm going to
 3    sentence you to a term of 11 months in prison.  In my mind, I'm
 4    sentencing you to 12 months, but I'm giving you a discount for
 5    what would be good behavior.  You are not allowed to get a          11:40:19
 6    reduction in sentence for good behavior unless you are
 7    sentenced to at least 12 months and one day.  So I'm going
 8    ahead and I'm giving you most of that discount.  So I'm going
 9    to sentence you to a term of 11 months.
10            That is too low except for the fact that I want to          11:40:34
11    position this so that you can be reunited with your children.
12    You are going to have to take your children with you to
13    Guatemala if you want to be with them.  They have a right to
14    remain in the United States because they are citizens.  But you
15    have to be in Guatemala.  So for those reasons, I'm going to       11:41:06
16    deliver that sentence.
17            Pursuant to the Sentencing Reform Act of 1984, it is
18    the judgment of the Court that Celestina Elizabeth Perez-Cos is
19    hereby committed to the Bureau of Prisons for 11 months.
20            Does the government care about the special assessment?     11:41:27
21            MS. STODDARD:  We move to remit, Your Honor.
22            THE COURT:  The special assessment is remitted on
23    motion of the government.  The court finds the defendant does
24    not have the ability to pay and orders the fine waived.
25            Upon release from imprisonment, the defendant shall be     11:41:37
```

```
1   placed on supervised release for three years.  While on
2   supervised release, the defendant shall comply with the
3   standard conditions of supervision adopted by this Court in
4   General Order 12-13.  Of particular importance is you shall not
5   commit another federal, state, or local crime during the term        11:41:54
6   of supervision.
7          The defendant shall comply with the following
8   additional condition:  If deported, you shall not reenter the
9   United States without legal authorization.
10         The Court adopts the facts as set forth in the           11:42:06
11  presentence report in support of the guideline calculations and
12  the reasons for sentence except as I have found otherwise in
13  this proceeding.  And that requires a downward variance of
14  three levels.  I think it's three levels.  I will grant that
15  downward variance based on extraordinary family circumstances.  11:42:33
16         The Court finds the sentence to be reasonable in light
17  of the facts and the statutory purposes of sentencing and to be
18  sufficient but not greater than necessary to serve the
19  statutory purposes of sentencing.
20         Ms. Perez-Cos, do you understand the sentence?       11:42:59
21         DEFENDANT PEREZ-COS:  Yes.
22         THE COURT:  And would both counsel confirm that the
23  sentence complies with the plea agreement?
24         MR. JUAREZ:  It does, Your Honor.
25         MS. STODDARD:  Yes, Your Honor.                    11:43:10
```

UNITED STATES DISTRICT COURT

1       THE COURT:  I find that the sentence complies with the

2   plea agreement, and therefore, that the defendant has waived

3   the right to appeal the judgment and the sentence.  However,

4   Ms. Perez-Cos, if you wish to attempt to appeal notwithstanding

5   your waiver of your right to appeal, you must file a notice of        11:43:24

6   appeal within 14 days of today.  If you request, a notice of

7   appeal will be prepared for you and filed for you.  If you

8   cannot provide an attorney for yourself, an attorney will be

9   provided for you for purposes of an appeal.

10      Ms. Stoddard, do you have a Motion to Dismiss?                     11:43:41

11      MS. STODDARD:  Yes, Your Honor, the remaining counts

12  in the indictment.

13      THE COURT:  It is ordered dismissing Counts 1, 2, and

14  3 as to this defendant only.

15      All right.  I think, Mr. Juarez, it would be good if             11:43:50

16  Ms. Perez-Cos can hear the proceedings with respect to Mr.

17  Andres, so if you will step over to the side.  And Mr. Baggot

18  and Mr. Andres can come to the microphone.

19      Now, where we left off with you, Mr. Andres, is I am

20  considering rejecting the plea agreement.  And I'm thinking if        11:44:19

21  counsel can tell me if you have a different view to give the

22  greatest opportunity to be heard on this.  Perhaps, Mr. Baggot,

23  I should just hear the allocution from both sides.  But I would

24  be hearing that both with respect to whether to accept the plea

25  agreement and if I do, then I would proceed with sentencing.          11:44:43

1          Do either counsel have any concern with proceeding

2    that way?

3          MR. BAGGOT:  No.  That's fine.

4          MS. STODDARD:  No, Your Honor.

5          THE COURT:  And Mr. Baggot, would you prefer to          11:44:54

6    allocute first or after the government?

7          MR. BAGGOT:  Oh, I will go first.  I'm used to doing

8    that.

9          Your Honor, first, as an overview of this case, I

10   would say this girl made a good decision to come to the United   11:45:03

11   States whether she got paid or not.  Many people from

12   Guatemala, other countries from South and Central America come

13   to the United States.  They are very happy to live with a

14   family even if they don't get paid at all.  Her life in

15   Guatemala would have been pretty grim.  You have to keep in     11:45:20

16   mind half this world lives on $2 a day or less.  So if 15 cents

17   an hour, even accepting those figures, is probably about what

18   she would have gotten paid in Guatemala.  And people come from

19   Guatemala and forcibly enter or illegally enter into Mexico and

20   they are dealt with quite harshly.  I'm sure you have seen the   11:45:42

21   reentry cases where people work for 6, 8, 10, 12 dollars a day,

22   not an hour, a day, in very difficult circumstances where

23   there's fields, a lot of sun, very hot, very cold.

24          This girl was getting more than just the so many cents

25   an hour that you are referring to.  She had all of her food,     11:46:03

1   clothing.  I'm sure she had the opportunity to watch the

2   television set, as many of them do, play with the children.

3   And bear in mind that even though she came into this country as

4   a minor, she left as an adult, or at the end of this.  She had

5   almost completed her three years.  She was here from age 16 to          11:46:23

6   19.  So halfway through that she became an adult also.  So

7   she's not just a minor all the time.

8          She was given the opportunity to leave.  She

9   voluntarily said she wanted to stay here.  Even after the

10  pregnancy, the hospital, and all this work by social workers to         11:46:42

11  convince her she was a victim, she still went home to the

12  family and she didn't respond to the social workers' call.  The

13  discovery is that they called her like 40 times on her cell

14  phone to get her cooperation in prosecuting this case, and she

15  wouldn't do it.                                                          11:47:02

16         That was her mode of thinking.  She wanted to go home

17  to the family.  That's where she had been for two to three

18  years.  That's where she wanted to go back.  So the situation

19  is really not the typical work situation where somebody is

20  working in a shoe factory and then they have to pay their home          11:47:18

21  expenses.  On the whole, it's hard to see that there was really

22  a financial benefit to the Andreses.  By the time you pay for a

23  16-year-old and then a 19-year-old in the house, I know what it

24  costs to have children in the house, anybody, any age.  Things

25  cost a lot of money.  She was getting the benefits of that and          11:47:40

1    they were quite considerable benefits.

2            My information now is that she's been granted a visa

3    by the government of Guatemala and that she's been granted a U

4    Visa for being a victim.  And frankly, I'm not sure how the

5    duration of the U Visa, whether she has a right to stay or                    11:47:57

6    whether that's limited in time.  She has that temporarily and

7    so she's been here all this time.

8            The discovery shows that the relation between Mr.

9    Andres and the girl was very good.  Even from the very

10   beginning she says he helped me.  He was the only one I could          11:48:11

11   talk to here, that he stood between her and the wife who she

12   had disagreements with all the time.  And as I say, they got

13   too close there at the end, but even so, she continued the

14   relation with him even after she had become pregnant the first

15   time.                                                                                       11:48:32

16           So we submit that this is not a case, anything even

17   close to slavery.  This was a benefit.  Maybe there was some

18   harm in the legal sense to the girl, but if you look at it on

19   balance and the overview, the broader picture, she had many

20   benefits from being here.  I have to wonder if she would do it       11:48:48

21   again.  She may.  She may have made that decision.  My guess is

22   she will want to stay in the United States, having been here

23   for three or four years now.  My guess is that she would like

24   to stay here and not go home to Guatemala.  It's a bleak life

25   that awaits her in Guatemala.                                                   11:49:06

1        And this is not somebody running a shoe factory where
2   people have to work 18 hours a day for pennies.  This is a
3   family.  Seemed like a fairly decent family.  They go to
4   church.  They go shopping.  They go to the mall.  They do
5   things that typically families do.  So it's not all as bleak
6   the government makes the picture out to be.

7        So for these reasons, we ask the Court to accept the
8   agreement.  Frankly, I had considered trying this case under
9   forced labor.  It seems like a challenge and interesting case
10  if nothing else.  I think that statute was enacted principally
11  in the sex trafficking cases where you have young girls who are
12  impressionable and susceptible and by commercial organizations
13  that exploit numbers of people for long hours of hard labor
14  without paying their room and board, without taking them into
15  the family situation.  I think that's what Congress really had
16  in mind.

17        So we ask the Court to accept this agreement.  And our
18  recommendation is we feel this is a low end case, not a high
19  end case.  He was good to her all the time.  They got along
20  well.  She received the benefits of living in the United States
21  as opposed to very primitive, bleak conditions in Guatemala.
22  She did benefit from this.

23        THE COURT:  By that reasoning, we should welcome all
24  of the human trafficking possible as people who are better off
25  here working at 15 cents an hour than in the desperate third

1   world countries they come from.

2        MR. BAGGOT:  That's the open borders point of view,

3   yes.  There are organizations that advocate that.

4        THE COURT:  Congress has rejected that.  We have this

5   statute that makes this crime punishable for up to 20 years in          11:50:45

6   prison for doing that.

7        MR. BAGGOT:  Well, as I say, I think the purpose of

8   that was in the commercial setting and in the sex trafficking

9   setting primarily, even though it may cover this situation.  We

10  didn't try the case.  Would have been an interesting case to          11:51:00

11  try, by the way.

12        But in any event, we ask the Court to impose the low

13  end.

14        THE COURT:  Ms. Stoddard.

15        MS. STODDARD:  Yes, Your Honor.  The government is          11:51:09

16  recommending a term at the high end of the guideline range,

17  which is actually higher than the recommendation by the

18  presentence report writer.  I am not going to rehash all the

19  facts again.  I laid them out in my objection and they have

20  been very thoroughly discussed here in the hearing today.          11:51:28

21  Obviously, the government has a different position about --

22  yeah, about the circumstances and what occurred in this case.

23        Specifically addressing the plea agreement, in

24  fashioning the plea agreement we also did consider similarly

25  situated defendants.  It's a little difficult because this is          11:51:44

```
1    one of the first labor trafficking prosecutions in the District
2    of Arizona.  So I did reach out to my counterparts in D.C. and
3    around the nation trying to find out --
4              THE COURT:  We have all the time we need.
5              MS. STODDARD:  And candidly to the Court, the proposed     11:52:02
6    sentence of 27 months is actually higher than sentences that
7    had been imposed in similar circumstances.  There was a case
8    out of Texas where an individual was not a minor, was an adult
9    but was held under slightly similar circumstances as far as a
10   contract and labor and forced labor for a longer period of      11:52:21
11   time.  And that individual got a lower sentence.
12             So we were trying to balance the impact on the victim
13   in this case --
14             THE COURT:  On the other hand, we have what at least
15   started out as un-consensual sexual intercourse and pregnancy     11:52:33
16   with serious physical harm.
17             MS. STODDARD:  Yes.
18             THE COURT:  That's a factor here that I suspect you
19   don't have in the others.
20             MS. STODDARD:  Correct.  Correct.  And that's why we     11:52:46
21   eventually came to this proposed resolution which was a higher
22   sentence, which not only locked the defendant in to a term of
23   imprisonment in contrast to his wife, Ms. Perez-Cos, where
24   essentially was a cap at 18 months and the Court could downward
25   depart and go as low as felt was appropriate.  We locked this     11:53:04
```

1    defendant into a substantial term of imprisonment because we

2    did feel that was warranted.  We did feel that it was

3    appropriate based on everything that had occurred here.

4         As sort of poetic note, the proposed term of 27 months

5    is actually similar to the term that she spent in their home    11:53:19

6    and under these circumstances, so there was something kind of

7    cathartic in that in that it was --

8         THE COURT:  But what about this is, in fact,

9    widespread.  This is done widely.  It is deterrable.  It is

10   reprehensible conduct.  It is just gross human exploitation of    11:53:40

11   the weak and the poor.  And there must be substantial benefit

12   to the public and awareness.  I know the government issues

13   press releases on some of these cases, that this trafficking --

14   he arranged the importation.  Claims to have paid the fee he

15   says was $4,000.  Who knows.  Imported her, exploited her.  The    11:54:12

16   quantum of human suffering that will be reduced by having a

17   significant consequence and a visible consequence for this kind

18   of gross human exploitation is likely to be very, very great.

19   So that comes to the public deterrence purpose of sentencing.

20        The guidelines for the forced labor are, what, 46 to    11:54:43

21   57 months, and that doesn't count the sexual exploitation with

22   the consequent pregnancy and physical pain and harm.  Doesn't

23   even count that.  So if we look at the guidelines for that, the

24   guideline sentence without considering that would be a windfall

25   to this kind of conduct.    11:55:06

1       So I routinely sentence people to prison longer than

2  this just for illegally entering the country when they have

3  serious criminal history.

4       MR. BAGGOT:  Your Honor, just a brief comment?

5       THE COURT:  You may.                                    11:56:11

6       MR. BAGGOT:  The history and characteristics of the

7  defendant are that he has a misdemeanor conviction 10 years ago

8  and that's all.

9       THE COURT:  Yeah.  Yes.  He had the illegal entry.

10 Obviously, he entered again.                                  11:56:44

11      I cannot persuade myself that a sentence of 27 months

12 adequately reflects the gravity of the offense conduct in this

13 case, and therefore, I reject the plea agreement.  I have not

14 yet accepted the guilty plea, either.  A more serious sentence

15 is necessary, and again, I have already made remarks on the     11:57:37

16 forced labor and additional grave consequences of his sexual

17 exploitation of this young woman.

18      So Mr. Andres, the Court will not accept the plea

19 agreement.  You have the right to withdraw your plea of guilty.

20 If you persist in the guilty plea, the disposition of the case  11:58:09

21 may -- will be less favorable than what is contemplated in the

22 plea agreement.  Now, you have the right to decide how you

23 would like to proceed.  And if you would like some time to

24 consider that, we'll reschedule a time to come back.

25      If you -- Mr. Baggot, if you want to confer with him     11:58:29

1    if he would like to make a decision now, but I wouldn't want

2    him to do that unless he's confident.

3              MR. BAGGOT:  Your Honor, the rule doesn't say he has

4    to make a decision right now.  I would ask the Court to put

5    this off and let us talk about it and see what we can do.          11:58:45

6              THE COURT:  Let's set a time.  Is two weeks plenty?

7              MR. BAGGOT:  Yes, that's fine.

8              THE COURT:  All right.  Nick, give us a time to resume

9    this proceeding.

10             THE COURTROOM DEPUTY:  3:30 on August 3rd.             11:58:59

11             MR. BAGGOT:  What was that, Nick?

12             THE COURT:  3:30 on August 3rd.  That's a Monday,

13   right?

14             MR. BAGGOT:  That's a Monday.  August 3rd would be

15   fine.                                                          11:59:21

16             THE COURT:  It is ordered continuing the sentencing

17   hearing until 3:30 on August 3rd.

18             Counsel, again, I appreciate -- and the defendants, I

19   appreciate your patience for this long proceeding.  But as I

20   said, I never rush anyone in these proceedings.                11:59:32

21             So with that, I'm going to take a short recess.

22             (Proceeding concluded at 12:00 p.m.)

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 7th day of October,

15   2015.

16

17                                   s/Laurie A. Adams

18                         _____
                           Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25