1           **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3                   _____

4

   **United States of America,**   )

5                                      )   No. **CR 14-1461-PHX-NVW**
           Plaintiff,   )

6                                      )

7           vs.                        )   Phoenix, Arizona
                  )   August 12, 2015
   **Javier Sebastian Andres (1),** )   9:28 a.m.

8                                      )
                                       )

9           Defendant.                 )
  _____)

10

11          **BEFORE:   THE HONORABLE NEIL V. WAKE, JUDGE**

12          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

13                  (*Sentencing-Resumed*)

14   **APPEARANCES:**
   For the Plaintiff:

15           U.S.  ATTORNEY'S OFFICE
             By:  **Rachel Reames Stoddard, Esq.**

16           2 Renaissance Square
             40 N. Central Avenue, Suite 1200

17           Phoenix, AZ 85004

18   For the Defendant:
             LAW OFFICE OF ATMORE L. BAGGOT

19           By:  **Atmore L. Baggot, Esq.**
             1615 North Delaware Dr.

20           Apache Junction, AZ 85120

21   Official Court Reporter:
   Laurie A. Adams, RMR, CRR

22   Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43

23   Phoenix, Arizona 85003-2151
   (602) 322-7256

24

   Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared by Computer-Aided Transcription

```
 1                    P R O C E E D I N G S
 2              (The defendant was assisted during the following
 3     proceeding by the official court interpreter.)
 4              THE COURTROOM DEPUTY:  This is Criminal Case
 5     2014-1461-01, United States of America versus Javier Sebastian      09:28:21
 6     Andres.  This is time for continuation of sentencing.
 7              Counsel, please announce for the record.
 8              MS. STODDARD:  Good morning, Your Honor.  Rachel
 9     Stoddard on behalf of the United States.  I'm joined at counsel
10     table by Ryan Blay of the FBI.                                     09:28:35
11              MR. BAGGOT:  Atmore Baggot for the defendant, who is
12     present in court.
13              THE COURT:  Good morning, counsel.  Good morning, Mr.
14     Andres.
15              I apologize to all for being late.  I have another        09:28:45
16     emergency I have been working on since very early this morning.
17     But we have all the time we need.
18              All right.  I think where we left off, Mr. Baggot, you
19     had a number of objections that we had outlined that we were
20     going to present.  I have your brief which -- and the principal    09:29:05
21     case the government has cited, which I have read.  So let me
22     let you present your objections in the sequence you want and in
23     the detail you want.
24              You may proceed.
25              MR. BAGGOT:  Your Honor, regarding the four-level         09:29:17
```

```
1    increase, it's our position that the defendant was not
2    harboring the girl at the time.
3            THE COURT:  That's because he had delivered her to the
4    hospital?
5            MR. BAGGOT:  Had turned her over.  She was in the care      09:29:29
6    of social workers, hospital staff, whatever else they have.  So
7    she wasn't being harbored in any sense.  And the guidelines
8    indicate that these increases are something that happened
9    during the period of harboring.  And she wasn't being harbored.
10           THE COURT:  And give me the guideline again.              09:29:48
11           MR. BAGGOT:  2L1.1(b)(7)(B).
12           THE COURT:  And it says, quote, "If any person died or
13   sustained bodily injury, increase the offense level according
14   to the schedule."  It would be four levels for serious bodily
15   injury.                                                          09:30:21
16           And is there an application note that helps here?
17           MR. BAGGOT:  Well, just what I have in the memo.
18           THE COURT:  Well, Ms. Stoddard, I will hear your
19   response.
20           MS. STODDARD:  Yes, Your Honor.                          09:30:35
21           THE COURT:  And I have read your briefs.
22           MS. STODDARD:  Then I will not belabor the facts in my
23   brief.  It's the government's position the victim was still
24   being harbored not only due to the very short amount of time
25   from when she was delivered to the hospital to when the injury  09:30:49
```

```
 1    occurred, but also the fact that the defendant, when he dropped

 2    her off at the hospital, gave her a fake address as well as his

 3    wife's or co-defendants cell phone number to provide in case

 4    anyone needed contact information from her, and that she was

 5    also directed to call them upon discharge.  She did so.  They        09:31:04

 6    came.  They took her back and she lived under essentially the

 7    same conditions as prior to being delivered to the hospital.

 8         THE COURT:  Let me ask a threshold question, which is

 9    in Mr. Baggot's assumed -- his contention where the bodily

10    injury has to happen while the person is being harbored, but         09:31:23

11    I'm looking for the textual basis for this because the

12    guideline just says if any person died or sustained bodily

13    injury, increase the offense level.  It doesn't say sustained

14    bodily injury while being harbored.  So we can imagine in

15    hypothetical situations that this one is actually quite similar      09:31:50

16    to some of the hypotheticals one might come up with.  So this

17    is a threshold issue.  What is the basis for concluding that

18    the actual injury must be suffered while the harboring is done

19    as opposed to a direct and foreseeable consequence of the

20    harboring?                                                           09:32:13

21         And I guess that's a question for Mr. Baggot first.

22         MR. BAGGOT:  Your Honor, basically the structure of

23    the guidelines, all the B, Section B increments are based on

24    something that happens during the harboring period such as

25    detention and weapons and so forth.  And reading it in context,     09:32:29
```

1  I agree it's not -- it could be clearer, but I think that's

2  what the guidelines are saying, that those increments are just

3  what happens during the harboring.  If someone has serious

4  injury 10 years after they are released, that's not

5  attributable to the defendant.                                    09:32:49

6          THE COURT:  Well, do you want to say more?  You are

7  welcome or --

8          MR. BAGGOT:  No.  That's all.

9          THE COURT:  Ms. Stoddard.

10         MS. STODDARD:  Your Honor, the only thing I could         09:32:57

11  point to is the *U.S. v. Rodriguez-Cruz* case cited in my memo,

12  255 F.3d 1054.  In that situation, the alien who perished, an

13  application enhancement was applied to the defendant because an

14  alien died.  The alien who perished had actually left the group

15  and was no longer in the custody of the smuggler at the time he  09:33:17

16  passed away.  So the Court did go into kind of a foreseeability

17  test and whether it was foreseeable and whether it was a risk

18  that was assumed in the course of the conduct.  So I think as

19  long as the injury was sustained either during the harboring or

20  as a result of the harboring and defendant's actions in the      09:33:34

21  harboring then the case law would support applying an

22  enhancement.

23         THE COURT:  Having thought about this, my conclusion

24  is that the text does not require a mechanical connection,

25  identity of the time of the suffering to be during the time of   09:33:49

1    the harboring; rather, the requirement is causation.  And a big

2    part of causation is foreseeability.  Here, and as we all know,

3    causation in law is more than just but for causation.  It is

4    kind of a moral responsibility for events of which

5    foreseeability is a big part.  Here, the causation is clear by      09:34:14

6    any standard of proof, and the foreseeability is as well.  The

7    victim here was harbored in a -- not only harbored but in a

8    substantially involuntarily intimidating way.  The victim was

9    sexually taken advantage of, first involuntarily and later by

10   seduction, by what obviously were false pretenses, the result      09:34:45

11   of which was that she became pregnant and received no prenatal

12   care.  None.  And dropping her off, whether it's at the

13   entrance to the hospital or the parking lot to the hospital

14   with no prenatal care while she is in labor has very obvious

15   foreseeable risks of injury to the woman in connection with the     09:35:07

16   delivery.  And indeed she delivered the baby a half an hour

17   after getting to the hospital.

18        And moreover, Mr. Andres has personal familiarity with

19   childbirth and children.  He had been the father of nine other

20   children by, I think, multiple mothers before this 10th child      09:35:28

21   that he fathered.  So everything was foreseeable.  The failure

22   to attend to prenatal care and simply depositing her in the

23   hospital while she was in labor meets the highest levels of

24   persuasion with respect to causal connection between the harm

25   done to the victim and her having been illegally harbored and      09:35:56

1    in the particular context of her harboring with the fear and

2    intimidation and with the specific injuries to her, the serious

3    bodily injury in connection with the delivery.  So the

4    objection is overruled.

5           So go ahead, Mr. Baggot.  Any further objections?          09:36:16

6           MR. BAGGOT:  No.  I re-raise the two-level objection,

7    but as the government says, the Court has already ruled on

8    that.  Just for the record.

9           THE COURT:  I stand by that ruling.

10          MR. BAGGOT:  Your Honor, proceeding on to the general      09:36:32

11   sentencing, we point out --

12          THE COURT:  Actually, I can't remember.  We had a

13   lengthy discussion last time, but did I accept the guilty plea

14   and pronounce the --

15          MR. BAGGOT:  I don't think you did, Your Honor.           09:36:48

16          THE COURT:  I wasn't sure either.

17          MS. STODDARD:  I don't believe so either, Your Honor.

18   If we could just run through.

19          THE COURT:  I would rather duplicate than omit.

20          So there being no -- and as we had discussed before       09:37:00

21   this does bear upon defendant and Mr. Baggot's strategy.  I had

22   not accepted the guilty plea to this one count, and I -- as I

23   view it, I was free to reject it.  But I decided to accept the

24   guilty plea to this one count.  I'm not frustrating either the

25   defendant's strategy or the government's options.                09:37:21

1          Therefore, the defendant has pleaded guilty before the

2     magistrate judge on Count 4 only, and the magistrate judge has

3     recommended that the Court accept the guilty plea.  The Court

4     will accept the defendant's guilty plea on Count 4 only.  There

5     having been a determination of guilt by virtue of the          09:37:48

6     defendant's guilty plea, it is the judgment of the Court that

7     the defendant is guilty on Count 4 of harboring an alien for

8     private financial gain, in violation of Title 8, United States

9     Code Section 1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), and

10    (a)(1)(B)(i).                                                   09:38:10

11          The other counts are not adjudicated or dismissed and

12    remain pending before the Court.  We'll address later setting a

13    trial date for them.

14          The Court will accept the plea agreement as to Count 4

15    only, and the judgment and sentence will be consistent with it, 09:38:32

16    there really being no agreements concerning sentencing.

17          I'm satisfied that the plea agreement adequately

18    reflects the seriousness of the actual offense behavior and

19    that accepting the agreement will not undermine the statutory

20    purposes of sentencing or the sentencing guidelines.  And I     09:38:50

21    reach this conclusion because of the Court's authority under

22    the law and the guidelines to consider all of the offense

23    conduct that is adequately proven.  And only because of that do

24    I reach that conclusion.

25          And there are no agreements with respect to sentencing    09:39:09

1   because the Court has rejected the plea agreement and the

2   defendant has elected to request to have his guilty plea

3   accepted in any event.

4         The Court finds that the offense level computations,

5   the total offense level, the defendant's criminal history        09:39:28

6   category, and the applicable ranges are as stated in the

7   presentence investigation report.

8         Mr. Baggot, you know, I have been -- in recent times,

9   I have been deferring to the defendant's choice as to whether

10  the defendant would like to allocute first or after the          09:39:44

11  government.  So I invite you to tell me what your preference

12  is.

13        MR. BAGGOT:  I don't have a preference, but I will go

14  anyway if that's okay.

15        THE COURT:  All right.                                      09:39:53

16        MR. BAGGOT:  Your Honor, the defendant has a very thin

17  criminal history.  He's been basically a good citizen of

18  Guatemala.  He has one misdemeanor conviction which was 10

19  years ago, we point out, for which he was sentenced to 60 days

20  and that's the extent of his criminal history.  We know that     09:40:07

21  he's a very active church goer.  He's been active in his

22  church.  We have submitted letters to the Court which comment

23  very well on his conduct.  The people who saw the girl in the

24  family situation comment that it looked like a pretty normal

25  church-going type of family.  There was no obvious outward       09:40:28

1   signs of distress within the family.  And people were kind of

2   surprised to see that the girl was actually considered a victim

3   in any sense.

4        We point out that her -- she claims she worked 15

5   hours a day.  We dispute that.  She -- if you read her                09:40:44

6   commentary she talks about what happens after her chores are

7   done, that she wants to watch racy television shows, the

8   Telenovelas in Spanish and the wife doesn't want her to do

9   that.  Actually, the most insights into this case come from the

10  disputes between the girl and the wife.  And the television          09:41:04

11  dispute is the one after she gets done with her work.  So we

12  question whether she's really working 15 hours a day.  And, of

13  course, it's a relatively small house.  I know there are five

14  children, but they are away at school and it's hard to see what

15  there really could be done for 15 hours a day.  And I'm sure         09:41:22

16  the children have their own activities when they are not even

17  home.

18       The report also comments that she was detained for a

19  period of 30 months.  Well, the beginning of her period with

20  the family was purely voluntary on her part.  She was not            09:41:36

21  forced to come from Guatemala.  They talked -- this family

22  talked to that family, and they worked out an agreement.  True,

23  the agreement wasn't performed in all respects, and it didn't

24  work out very well, but she was not detained in the early part

25  of those 30 months.                                                  09:41:57

1          Also, she did have considerable freedom.  They went

2    shopping together.  They had disputes -- there's another

3    dispute that provides some insight.  The girl wanted more

4    boy-attracting type of clothes and the wife wanted more

5    straight-laced, more morally-based type of looser clothing.          09:42:14

6    And they had these ongoing disputes over relatively minor

7    intrafamily things.  And, of course, they go to church, they go

8    to events, they go shopping.  So it isn't like she was working

9    in a shoe factory 15 hours a day.  She was basically integrated

10   into the family.  She was the sixth child.  And the reports          09:42:36

11   show that he's out in the front of the yard.  The neighbors see

12   her playing with the other children, because she was 16 when

13   she came.  She was kind of an older child is what it was.

14          So it wasn't all just work.  It isn't like she was in

15   a mine or in a shoe factory working all those hours every day.       09:42:53

16   And most tellingly, I think, even after she was set free and

17   under the tutelage of the social workers and Catholic Charity

18   Services, she elects to go home.  And the record is the social

19   workers called her like 40 times on her private cell phone and

20   she still didn't want to come back to the hospital and she           09:43:15

21   didn't consider herself a victim at that point in time.  She

22   wanted to stay with the family.

23          THE COURT:  What about that?  I can take it as

24   persuasive that she was reluctant to accept these invitations.

25   But it's a step to go from that to conclude that she didn't          09:43:37

1    think of herself as a victim.  Her reluctance to extricate

2    herself could well have been because of victimization, fear,

3    lack of understanding.  With respect to that, it appears that

4    you are asking me to make an inference in favor of the

5    defendant where the opposite inference that she was                    09:44:00

6    intimidated, lacked freedom, was -- is at least as compelling

7    an inference.

8           I say that because I'm -- this is a case because of

9    our situation of having rejected the plea agreement, had candid

10   discussions with Mr. Andres and him having elected to stand by        09:44:24

11   his plea agreement to the one count, where the abstract terms

12   of the guidelines about considering the totality of the offense

13   conduct really comes into play in a powerful way because there

14   is no unfairness.  Often I think there is an unfairness to

15   considering all the offense conduct when you have a plea             09:44:48

16   agreement, but there is no unfairness here.

17          So I have got to think through what is persuasive at

18   least by a preponderance of the evidence, perhaps even more,

19   and not make judgments just on possibilities.  And that cuts

20   for both sides.  I intend to not assume any factual basis to        09:45:11

21   which I am not persuaded at least by a preponderance of the

22   evidence.

23          So your argument that she didn't think she is a

24   victim, I remain to be persuaded about that.

25          MR. BAGGOT:  Well, Your Honor, I have often thought of        09:45:30

1    what would have happened had this played out that she completes

2    her three years.  At that time, she has the option of staying

3    with the family, seeking a new job, or going back to Guatemala.

4    I question what she would have done.  My guess is she wouldn't

5    have found any other work in the United States.  She wouldn't          09:45:48

6    have a good recommendation from this family, and probably, she

7    would have just stayed where she is.  That's my guess.  Of

8    course, we don't know.  I think this is a situation you can see

9    whatever you are looking for.  The facts can go either way.

10        But our position, of course, is that she was                     09:46:03

11   integrated into the family.  She felt comfortable there.  She

12   knew the other five children.  We don't have much information

13   about her interaction with the other five children, but we

14   don't see any difficulties that are in the record, either.

15        So our interpretation is that she felt herself to be             09:46:19

16   the sixth member of the family.  She would have stayed there, I

17   don't know how long, after the term of three years was up.

18   That's conjecture in the future, of course, but that's an

19   interesting consideration.  But it is a sort of situation you

20   can see what you are looking for.                                     09:46:37

21        THE COURT:  Anything else?

22        MR. BAGGOT:  No.  That's it.

23        THE COURT:  All right.  Mr. Andres, is there anything

24   that you would like to say to the Court before sentencing?  You

25   do not have to say anything, but you are welcome to say              09:46:47

1    anything you would like.

2         THE DEFENDANT:  Yes.  Yes.  First, I want to thank God

3    for every person that is here.  As we know, as people we make

4    mistakes.  All of us do.  We all make mistakes.  And first, I

5    have asked God's forgiveness for all of these mistakes.  I                09:47:25

6    would like to say that I'm sorry to this country as well for

7    this mistake.  I would like to say that I am sorry to you, Your

8    Honor, since you have the law in your hands, I say I'm sorry to

9    you.  I would like to say that I am sorry to the prosecutor and

10   also I would like to say I'm sorry to the girl.  All I would            09:47:58

11   like to know is if you can give me an opportunity or a chance,

12   since my wife is going to be deported to Guatemala.  My kids

13   are also going to have to go to Guatemala.  And since the

14   situation is quite hard in Guatemala, and since the situation

15   is very hard, I want to know if you can give me a chance to go          09:48:33

16   with my family because they depend on my work.  I'm just asking

17   you for a chance, please.  God bless you all.

18         THE COURT:  Ms. Stoddard.

19         MS. STODDARD:  Yes, Your Honor.

20         I don't want to belabor facts that have already been              09:48:54

21   presented in previous hearings as well as in motions.  However,

22   the government, in its previous sentencing recommendation of 27

23   months, does believe that no less than that is warranted and is

24   appropriate in this case as far as a sentence.

25         Under 18-3553, some factors that have been considered            09:49:09

1   include the seriousness of offense, the nature and

2   characteristics of the offense, as well as the defendant, his

3   prior criminal history, which is minor, but does involve an

4   alien -- or involve an illegal entry offense.  Throughout the

5   course of this investigation from the victim's description as        09:49:27

6   well as other information that's been disclosed and seized, it

7   does appear that the defendant is, if nothing else, very

8   familiar with the smuggling and trafficking of individuals into

9   the United States from other countries.

10          And so also as deterrence to him for future conduct,         09:49:42

11  not only specific to human smuggling and smuggling others but

12  also in returning to the United States without legal

13  authorization himself, we do believe that a lengthy sentence is

14  warranted.

15          Just touching briefly on the fact of the victim,             09:49:58

16  considering herself as a victim --

17          THE COURT:  Slow down just a little bit.

18          MS. STODDARD:  The victim considering herself to be a

19  victim and whether she would have stayed, we know she didn't

20  stay.  She fled from the house with nothing but the clothes on       09:50:09

21  her back because she felt that was her only way out.  She had

22  lived with the defendant and his co-defendant for years when

23  she finally had contact with the social workers and had a very

24  brief contact with the social workers.  So when you balance

25  being debased and threatened and essentially told that she was       09:50:30

1  trash for years compared to a brief encounter with some social

2  workers and given her lack of experience in the States, her

3  lack of education, and her young age, it's not surprising that

4  she went back to that home because she thought it was the only

5  way, the only thing she could do.  It was only after being in          09:50:51

6  that home and continuing to think about what the social workers

7  told her as is contained in one of her interviews, when she

8  finally realized there are people that would help her is when

9  she left.

10          The circumstances of her living in the home obviously          09:51:05

11  are going to be debated between the government and the defense.

12  But it is not contested that she was a very uneducated and

13  naive young girl who came here to perform services for the

14  defendant.  Her family wasn't paid.  She wasn't paid.  She

15  wasn't given any money of her own.  She was not given a cell          09:51:25

16  phone of her own.  The number the social workers were calling

17  linked actually to the co-defendant, Ms. Perez-Cos.  So these

18  many, many calls that were placed were not to the victim.  It

19  wasn't to the victim and she wasn't answering the phone, it was

20  to the co-defendant.  The one time the phone was answered to          09:51:42

21  the social worker, it was passed to someone, a female, and if

22  it was Reyna, we're not even sure it was Reyna, it was passed

23  to a female and said no, no, I can't talk and hung up.

24          It is not to be ignored the impact that the pregnancy

25  had on her and on her ability to think that she could leave.          09:52:01

```
 1   Once taken advantage of by the defendant and the sexual
 2   relationship happened and she became pregnant, she, based on
 3   her culture and her upbringing, did not believe she could tell
 4   her family about that.  She did not think she could tell her
 5   family.  She did not think it could be revealed, that that         09:52:20
 6   would be an additional emotional harm to her if that would come
 7   out or if anyone would find out what happened that she was a
 8   pregnant woman who had become pregnant by a married man.
 9           THE COURT:  How old was she when she became pregnant?
10           MS. STODDARD:  She would have been 18.  She was an         09:52:38
11   adult, but a very young adult.
12           THE COURT:  And as I recall, she's Native American.
13   What tribe is she a member of?
14           MS. STODDARD:  She is Guatemalan.
15           THE COURT:  I thought her native language was an           09:52:49
16   Indian language.
17           MS. STODDARD:  Chuj.  C-H-U-J.  Chuj.
18           THE COURT:  All right.
19           MS. STODDARD:  So essentially, Your Honor, based on
20   all of these factors, this was a very serious offense.  It has    09:53:03
21   had a serious impact on her.  It is not something that she has
22   taken lightly.  It is not something that she is going to forget
23   very quickly and move on from.
24           So based on these factors, we would ask, given our
25   previous recommendation, that no less than that be imposed and    09:53:21
```

```
 1    we would also ask for the mandatory -- not the mandatory, but

 2    for the maximum amount of supervised release to follow.

 3            THE COURT:  What is -- perhaps the presentence report

 4    writer can help us with this.  But what is the guideline range

 5    for the dismissed count of forced labor?                          09:53:39

 6            MS. STODDARD:  Your Honor, I believe it is in

 7    Paragraph 93, because all of the counts would have been grouped

 8    together --

 9            THE COURT:  Right.

10            MS. STODDARD:  -- under 2H4.1.  So I believe with the    09:53:58

11    defendant's criminal history category it would have been 46 to

12    57 months.

13            THE COURT:  All right.

14            First of all, the factual predicates for my judgment

15    about sentencing are all stated to a burden of persuasion of at   09:54:35

16    least by a preponderance of the evidence, which means that I

17    exclude mere possibilities.  But the core of the offense

18    conduct here, with a few disputed areas, is largely laid out in

19    the presentence investigation report.  And I will just repeat

20    briefly what I said a moment ago, and that is, that in the        09:55:04

21    unusual circumstances of this case where the defendant -- I

22    have rejected the plea agreement, the defendant has elected to

23    proceed with the plea to the one count, there is no risk here

24    of any unfairness to the defendant in the Court considering the

25    totality of the offense conduct in arriving at a sentence as      09:55:23
```

the guidelines permit.  I do think it is not at all rare where

it can become unfair when a defendant enters into a plea

agreement with an actual expectation, a reasonable expectation

that certain other conduct that has -- to which he has not pled

guilty will not be considered.  But in this case, the core          09:55:50

conduct of the harboring is inextricably bound up with other

conduct.  And therefore, the conduct that I consider, I

conclude, there is complete fairness in the defendant for the

Court to consider all the offense conduct and the conduct that

I will mention is bearing on my thinking.                           09:56:08

          This is a case in which the count of conviction of

harboring for financial gain, a sentence within the guidelines

for that, this would be an extreme case in terms of

wrongfulness, culpability, and victimization for just harboring

for financial gain.  The other conduct of extended labor, which    09:56:40

even if we leave open the degree of coercion, I am persuaded,

and it is clear, that with a young woman with minimal education

from a different culture with no language or cultural ability

in this country, I am persuaded that she was not free.  And the

circumstances also suggest, and I am persuaded, that she would     09:57:11

have left if she felt free to do this.  This is a classic

example of human trafficking of a person with no cultural or

language abilities or ability to do anything to escape.  So we

have not just the harboring but extended harboring for close to

two years.  I don't remember the exact number of months but it     09:57:42

1   was around that.

2           The exploitation here is extreme.  The Court is

3   persuaded by the victim's account that her first experience of

4   sexual intercourse with the defendant was involuntarily.  Later

5   she acknowledged it became voluntary because he persuaded her          09:58:07

6   he was in love with her.  Well, for a 17- or 18-year-old, late

7   adolescent or young woman, especially in an environment of

8   desperation with no choices, that kind of deception and

9   dishonesty can have its likely effect but the effect of the

10  sexual exploitation and the pregnancy takes the offense conduct        09:58:33

11  here really far beyond just harboring for financial gain.  The

12  Court's required to consider a number of the statutory factors

13  including the seriousness of the offense conduct, the need for

14  the sentence to reflect the seriousness of the offense, to

15  promote respect for the law and to provide just punishment.            09:59:13

16  All those factors overlap to a large extent.

17          Related to that is the need to afford adequate

18  deterrence.  That includes deterrence to you, Mr. Andres.  I

19  don't think you are going to be in a position to commit this

20  kind of crime again in this country, and you probably will not         09:59:35

21  need to be deterred much.  But also of great importance is the

22  need to provide public deterrence.  That means communicating to

23  people in general, people who would be tempted to commit this

24  kind of crime to import a person illegally for the purpose of

25  extended, uncompensated labor and ultimately with sexual               09:59:56

exploitations as well.  People who are contemplating doing that

need to know there will be grave consequences.  For a

meaningful punishment to be provided here, we don't know how

many people we'll save, but it is a conclusive persuasion that

many people will be saved if it is shown that this kind of          10:00:17

conduct will be treated very seriously in this country.

       This is a dramatic example of peonage, or slavery,

forced conduct.  That's not the offense of conviction, but the

conduct here is inseparable from the conduct of the offense

conviction, which is the harboring.  And our society has made a     10:00:45

firm decision that there will be no forced labor, no slavery,

no peonage in our society.  We are all aware that there are

many areas in the country, of the world, where that does

happen.  Perhaps it happens in Guatemala.  I recently read it's

only within the last 30 years that the last country in the         10:01:09

world formally outlawed slavery.  It was in Mauritania.

Slavery was legal there until the 1980s.  And the reading I

have had shows that slavery as an institution is still

widespread in Mauritania as it is in many countries as a

practical matter.                                                   10:01:36

       So this is a case of importing peonage into our

country from a country where perhaps it goes on.  I don't know

about Guatemala.  But it is importing, whether you use the word

slavery or peonage, certainly a gross exploitation of a weak

person with promises of benefit, benefits that were not             10:01:57

forthcoming, and intimidation that prevented her from seeking

help, from going to the police or trying to return to her

family.  So this -- and I don't doubt that this trafficking in

human labor, including for children, this started out as

trafficking of a child, does exist.  It is not rare, and it is

a matter of the utmost gravity and reprehensibility.  And our

society deems it to be reprehensible even if other societies do

not.

    So considering all of that, first of all, I am

persuaded that even though what is presented here is persuasive

not just to a -- by a preponderance of the evidence but even by

clear and convincing evidence of what I have just outlined, I

also -- and I am persuaded that I should not give a sentence

that would be essentially the same as a sentence for the forced

labor.  And that is to reflect the fact that the defendant did

not plead guilty to that, although it is obvious that he --

well, I'm not going to say obvious.  If this went to trial, one

could make a presentation that the victim here wasn't really a

victim.  One could make that presentation.  And everybody in

this room could make their own judgment, but the likelihood

that a jury of 12 people would be persuaded that she was not

forced to remain there.  Everybody can make their own judgment,

and if there is a trial on that the jury will decide that.  But

there certainly is a high level of persuasiveness to that

effect.

1          So viewing this as a conviction of harboring for

2   financial gain with the other circumstances, those other

3   circumstances take this to a level of culpability and

4   victimization far beyond the usual heartland of mere harboring

5   for financial gain.                                           10:04:23

6          Another factor here is that this is the kind of a

7   crime that is deterrable, that is, it's the kind of crime that

8   people can think through and decide it's not worth taking the

9   risk.  Many crimes, unfortunately, are not -- they are very

10  hard to deter because they are affected by passion and        10:04:44

11  irrationality or impairment of the person.  So, for example, if

12  people are addicted to substances and then they become

13  intoxicated, then if they tend toward violence or other crime

14  they can't control themselves because they can't control

15  themselves from taking the substances which are addictive.    10:05:10

16  That is criminal conduct that is very hard to deter because the

17  physical addiction is the entry point for other crimes.

18         This is a crime like financial -- this is a financial

19  crime, starts out as a financial crime.  It's a decision to

20  profit from cheap labor in a country that disapproves of free  10:05:28

21  labor.  We have laws in this country for many areas, not all,

22  many areas that set the lowest amount of wage you can pay

23  someone.  This is a decision to profit from taking a youngster

24  from a rural life, virtually without education in a third world

25  country to bring her to this country to work essentially for   10:05:53

1    free.  And that's done for financial benefit.  People who do

2    that are capable of thinking through and saying, you know, I

3    see in the newspapers that people get caught for this and

4    there's serious punishment.  I think maybe it's not worth doing

5    it.  So that also favors a more substantial punishment.                10:06:14

6           There is the issue here of not only the sexual

7    exploitation which I have mentioned, but also what amounts to

8    the abuse of this unborn child.  This youngster became pregnant

9    and was provided no prenatal care, nothing, and dropped off at

10   the hospital with a false name when she was in labor.  We don't        10:06:49

11   really know the state of this child who was given up for

12   adoption.  But this kind of conduct is in knowing and reckless

13   disregard of the health risks not just of the mother but of the

14   child.  So the degree of reprehensibility of this conduct

15   ratchets up another level for the disregard of the unborn child       10:07:12

16   and the mother, again, taking this far beyond the normal

17   heartland of just making some money by harboring someone for

18   profit.  Most of the time that crime we see for people who are

19   involved in the transiting business or sheltering someone who

20   are on their way of coming into this country.  Usually they are        10:07:41

21   coming into the country voluntarily and not to end up in a

22   state of forced labor.

23          So considering all these factors, I conclude that a

24   serious punishment is appropriate and that the guidelines are

25   inadequate for the offense and conviction.  Again, I believe I         10:08:06

should sentence lower than what would be the guideline range

for the counts that were dismissed.  And on balance, I conclude

that an appropriate, minimally sufficient sentence is a term of

40 months in prison.

So Mr. Andres, I'm going to sentence you to a term of    10:08:26

40 months in prison.  Now, I am going to mention what I gave

your wife a very lenient sentence for the reasons I mentioned

in her proceeding.  And even though there is a high degree of

culpability in what she did, she also was doing this under your

guidance, direction, and leadership.  And the Court is required  10:08:50

to impose the lowest sentence that has an adequate prospect of

serving the purposes of sentencing.  And I gave her the benefit

of that in giving her that low sentence.  I give you the

benefit of that in giving you this sentence.

So for those reasons, I will impose that sentence.       10:09:10

All right.  Pursuant to the Sentencing Reform Act of

1984, it is the judgment of the Court that Javier Sebastian

Andres is hereby committed to the Bureau of Prisons for 40

months.  The defendant shall pay a special assessment of $100

which shall be due immediately.  The Court finds the defendant  10:09:30

does not have the ability to pay and orders the fine waived.

The defendant shall pay a total of $100 in criminal monetary

penalties, due immediately.  If imprisoned, payment of criminal

monetary penalties is due during imprisonment at a rate of not

less than $25 per quarter.  And payments shall be made through  10:09:48

1    the Bureau of Prisons Inmate Financial Responsibility Program.

2    The Court hereby waives the imposition of interest and

3    penalties on any unpaid balance.

4          Upon release from imprisonment, the defendant shall be

5    placed on supervised release for three years.  While on          10:10:03

6    supervised release, the defendant shall comply with the

7    standard conditions of supervision adopted by this Court in

8    General Order 12-13.  Of particular importance is you shall not

9    commit another federal, state, or local crime during the term

10   of supervision.                                                  10:10:20

11         The defendant shall comply with the following

12   additional condition:  If deported, you shall not reenter the

13   United States without legal authorization.

14         The Court adopts the facts as set forth in the

15   presentence report in support of the guideline calculations and  10:10:33

16   the reasons for sentence except as I have found otherwise in

17   this proceeding.  The Court finds the sentence to be reasonable

18   in light of the facts and the statutory purposes of sentencing

19   and to be sufficient but not greater than necessary to the

20   serve the statutory purposes of sentencing.                      10:10:48

21         Now, this sentence requires an upward departure or

22   variance, I think, of four levels.

23         THE PROBATION OFFICER:  Five levels, Your Honor.

24         THE COURT:  Five levels.  The Court will grant an

25   upward variance of five levels in light of the nature and        10:11:16

circumstances of the offense, the need for the offense to

reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment and the need to afford

adequate deterrence, especially public deterrence.

Mr. Andres, do you understand the sentence?                10:11:39

THE DEFENDANT:  Yes.

THE COURT:  Mr. Andres, you have a right to appeal

this sentence.  If you wish to appeal, you must file a Notice

of Appeal within 14 days of today.  If you request, a notice of

appeal will be prepared for you and filed for you.  If you      10:11:57

cannot provide an attorney for yourself, an attorney will be

provided for you for purposes of an appeal.

Now, Nick, tell me again, what is the speedy trial

date for the trial of the other counts?

THE COURTROOM DEPUTY:  I double checked on that this   10:12:15

morning.  We have 70 days from today, so October 21st.

THE COURT:  So October 21st.  Counsel, I want to set a

trial date that will be a firm trial date.  I'm really not

expecting that there would be any motions to continue.  And I

understand the government has not made a firm decision yet       10:12:36

whether to go to trial on the remaining counts.  I suppose --

well, there is always a prospect things might be worked out

between the parties.

But in any event, I want to set a firm trial date.  My

trial calendar is freed up for early October.  That would be     10:12:57

```
 1    just about two months from now.  And Nick, I think actually, I

 2    think we freed up the last week of September, but maybe that

 3    first week of October would be better.

 4              THE COURTROOM DEPUTY:  We could do that.

 5              THE COURT:  What day is that Tuesday, first Tuesday?        10:13:17

 6              THE COURTROOM DEPUTY:  October 6th.

 7              THE COURT:  I'm thinking a firm trial date of October

 8    6th for the remaining counts.  And let me invite counsel to

 9    tell me whether there's any reason this case could not be ready

10    for trial on the remaining counts by October 6.                      10:13:34

11              MS. STODDARD:  Your Honor, my only -- I think that

12    should be absolutely fine.  The only concern I would have is if

13    it does proceed to trial, one witness will need to brought in

14    from out of country.  But I think we could accomplish that

15    within the two months.                                               10:13:51

16              THE COURT:  Mr. Baggot, how is your calendar?

17              MR. BAGGOT:  Well, it's far from October, but I don't

18    have that much scheduled, no.

19              THE COURT:  We have -- you know, I have noticed the

20    number of trials has diminished.  The number of prosecutions         10:14:03

21    have fallen off.  So it's easier to fit these in our calendar.

22              So all right then.  We will set a firm trial date on

23    the remaining counts for October 6th at 8:45.  And let's see.

24    Let's count backwards for a schedule.  Thinking maybe of

25    setting a firm final pretrial conference on Friday, September        10:14:39
```

1  25th.  Any motions in limine would be due September 11.

2  Responses -- well, actually, we can give you a little more time

3  than that.  We'll say Wednesday, September 16; any responses by

4  Wednesday, September 23.  That's two days before.  And all

5  other pretrial documents, such as requested voir dire, jury            10:15:11

6  instructions, also by September 23.  That gives you all maximum

7  time before the final pretrial conference.

8        If there were to be any other motions that require

9  briefing and decision other than Motions in Limine to go

10  quickly I would need to have them filed.  I cannot imagine any,       10:15:30

11  but if there are any we would need to have them filed in time

12  to resolve before then.

13        So I think I will set September 11 as the deadline for

14  any other motions other than motions in limine; responses by

15  September 18.  Well, I'll tell you what.  Let's make it              10:15:49

16  September 9, Wednesday; responses by September 16, Wednesday;

17  and any replies by Monday, September 22.  And I will -- if

18  there is anything, I will have it on my plate to resolve no

19  later than the time of the final pretrial conference.

20        And, of course, if the government decides to abandon           10:16:13

21  the other counts or if you reach some other resolution let me

22  know as soon as possible because it enables me to use my trial

23  calendar for others.

24        MS. STODDARD:  Understood, Your Honor.

25        THE COURT:  Counsel, is there anything else before --          10:16:26

```
 1    and the remaining counts are not dismissed.  They remain
 2    pending.
 3             Counsel, anything else before we go to the next case?
 4             MS. STODDARD:  No, Your Honor.
 5             MR. BAGGOT:  No, Your Honor.                          10:16:37
 6             THE PROBATION OFFICER:  Your Honor, the defendant did
 7    raise some removal of paragraphs in the --
 8             THE COURT:  Oh.  Oh.  Very good point.  I remember.
 9    Now, and the government didn't object to that.  So --
10             MS. STODDARD:  The only one we requested remain was   10:16:52
11    Paragraph 93.
12             THE COURT:  And when I read that, I was in agreement
13    with that.
14             So it is ordered that the paragraphs, rather than list
15    them all, I will refer them to Mr. Baggot's motion to which    10:17:04
16    objections were made will be deleted.  And a revised
17    presentence report will be prepared, leaving Paragraph 93 in.
18    So you can prepare that in due course with the Bureau of
19    Prisons.
20             I'm going to take a short recess to retrieve my file   10:17:21
21    for the next case.
22             (Proceeding concluded at 10:17 a.m.)
23
24
25
```

1

2

3

4                    C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 8th day of October,

15  2015.

16

17                              s/Laurie A. Adams
                               _____
18                              Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25